1

**BRAYTON PURCELL LLP**
ALAN R. BRAYTON (Bar No. 73685)

2
PETER B. FREDMAN (Bar No. 189097)
CHARLOTTE E. SCOTT (Bar No. 225581)

3
222 Rush Landing Road
Novato, CA 94948-6169

4
Telephone: (415) 898-1555
Facsimile: (415) 898-1247

5
Email: pfredman@braytonlaw.com

6
Attorneys for Plaintiff

7
DAVID KECK and all persons similarly situated

8

9

10
UNITED STATES DISTRICT COURT

11
NORTHERN DISTRICT OF CALIFORNIA

12

13
DAVID KECK, individually and on behalf of all
others similarly situated,

14
Plaintiff,

15
v.

16

17
BANK OF AMERICA, a Delaware corporation;
CENTRAL STATES INDEMNITY CO. OF

18
OMAHA, a Nebraska Corporation; CSI
PROCESSING LLC, a Nebraska company; and

19
DOES 1-100,

20

21
Defendants.

22

23

24

25

26

27

28

| | |
|---|---|
| Case No. CV 08-1219 CRB | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Date: April 18, 2008
Time: 10:00 a.m.
Dept.: 8
Judge: The Hon. Charles R. Breyer

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.    ISSUE PRESENTED AND SUMMARY OF ARGUMENT............................1

III.    FACTS ................................................................................................2

IV.    ARGUMENT ........................................................................................5

    A.  THE FAC SATISFIES *TWOMBLY* TO THE EXTENT IT APPLIES ..........6

    B.  PLAINTIFF STATES CLAIMS FOR RELIEF UNDER THE UCL ...........6

        1.    <u>Plaintiff States a Claim For Unlawful Practices Based on Predicate Violations of the Federal Telemarketing and Consumer Fraud and Abuse Prevention Law</u>.....................................................6

        2.    <u>Plaintiff States a Claim For Unfair Practices Based On The Legislative Policy Against Fraudulent And Abusive Telemarketing Practices</u> ...............................................8

        3.    <u>Plaintiff States a Claim For Fraudulent Practices and False Advertising Based On The Telemarketing Sales Script</u>.....................9

    C.  PLAINTIFF STATES A CLAIM FOR INVASION OF PRIVACY BECAUSE IT IS ILLEGAL TO RECORD A TELEPHONE CALL IN CALIFORNIA WITHOUT *FIRST* INFORMING ALL THE PARTIES TO THE CALL ...................................................................10

    D.  PLAINTIFF STATES A CLAIM FOR RELIEF UNDER THE CLRA ......10

        1.    <u>The CLRA Applies Because This Transaction Involved Personal Services</u>.....................................................10

        2.    <u>The CLRA Applies To The Subject Financial Services Transaction</u> ...............................................11

        3.    <u>Defendants Committed Practices Proscribed By The CLRA</u>...........14

    E.  PLAINTIFF STATES A CLAIM FOR FINANCIAL ELDER ABUSE.....15

    F.  PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT ...........17

V.    CONCLUSION....................................................................................18

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

3
*Augustine v. FIA Card Servs., N.A.,* 485 F.Supp.2d 1172 (E.D.Cal.2007)..........................12

4
*Bell Atlantic Corp. vs. Twombly,* 127 S.Ct. 1955 (2007)......................................................5

5
*Hernandez v. Hilltop Fin. Mortg., Inc.,* 2007 WL 3101250 (N.D.Cal.2007) ...............12, 13

6
*In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922 (9th Cir.2000) .......................................13

7
*Jefferson v. Chase Home Finance LLC*, 2007 WL 1302984 (N.D.Cal.2007) ....................12

8
*Knox v. Ameriquest Mortgage Co.*, 2005 WL 1910927 (N.D.Cal.2005).......................11, 12

9
*Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir.2007)..............................8

10
*Negrete v. Fidelity & Guar. Life Ins. Co.,* 444 F.Supp.2d 998 (C.D.Cal.2006) ...........15, 17

11
*Van Slyke v. Capital One Bank,* 503 F.Supp.2d 1353 (N.D.Cal.2007)...............................12

12
*Wolk v. Green,* 516 F.Supp.2d 1121 (N.D.Cal.2007) .........................................................16

13

14

**California Cases**

15
*ARA Living Centers-Pacific, Inc. v. Super. Ct.,* 18 Cal.App.4th 1556 (1993)..............16, 17

16
*Berkley v. Dowds,* 152 Cal.App.4th 518 (2007) .................................................................16

17
*Berry v. Am. Express Publ., Inc.*, 147 Cal.App.4th 224 (2007) .............................11, 12, 13

18
*Cel-Tech Comm., Inc. v. Los Angeles Cell. Tel. Co.,* 20 Cal.4th 163 (1999).......................8

19
*City of Ukiah v. Fones,* 64 Cal.2d 104 (1966) ...................................................................10

20
*Corbett v. Hayward Dodge, Inc.*, 119 Cal.App.4th 915 (2004)..........................................12

21
*Fairbanks v. Super. Ct.,* 154 Cal.App.4th 435 (2007) .......................................................12

22
*Fairbanks v. Super. Ct.,* 171 P.3d 1 (Cal. Nov 14, 2007) (NO. S157001) ........................12

23
*Flanagan v. Flanagan*, 27 Cal.4th 766 (2002)...................................................................10

24
*Ghirardo v. Antonioli*, 14 Cal.4th 39 (1996)................................................................17, 18

25
*Intrieri v.  Super. Ct.*, 117 Cal.App. 4th 72 (2004) ...........................................................15

26
*Kagan v.Gibraltar Sav. & Loan Ass'n*, 35 Cal.3d 582 (1984) ..........................................12

27
*Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4th 95 (2006) .........................................10

28
*Lauriedale Assocs., Ltd. v. Wilson,* 7 Cal.App.4th 1439 (1992)........................................17

**California Cases (cont'd)**

*Melchior v. New Line Prod., Inc.,* 106 Cal.App.4th 779 (2003)........................................17

*Schnall v. Hertz Corp.,* 78 Cal.App.4th 1144 (2000)...................................................8, 9

*Smith v. Wells Fargo Bank, N.A.,* 135 Cal.App.4th 1463 (2005) .......................................6

**Federal Statutes**

15 U.S.C.A. § 6101 *et seq.*...........................................................................................6, 8

15 U.S.C.A. § 6102(a)(3)(C)..............................................................................................6

**California Statutes**

Bus. & Prof. Code §§ 17200 *et seq.* ..............................................................................6, 9

Bus. & Prof. Code §§ 17500 *et seq.* ...................................................................................9

Civil Code § 1750 *et seq.* ...................................................................................................1

Civil Code § 1754 ............................................................................................................13

Civil Code § 1755 ............................................................................................................13

Civil Code § 1760 ......................................................................................................11, 13

Civil Code § 1761 ............................................................................................................11

Civil Code § 1770 ............................................................................. 11, 13, 14, 15

Penal Code § 632..............................................................................................................10

Welf. & Inst. §§ 15600 *et seq.*........................................................................................15

Welf. & Inst. § 15657.5....................................................................................................15

**Code of Federal Regulations**

16 C.F.R. § 310.1 *et seq.* .........................................................................................6, 7, 8

**Federal Rules of Court**

FRCP Rule 8(a)(2) ........................................................................................................1, 5

FRCP Rule 9(b) ....................................................................................... 1, 9, 10

## I.    <u>INTRODUCTION</u>

Defendant Bank of America (BOA) has a relationship with the other defendants (an insurance company and a related LLC) whereby they jointly market an insurance-like "debt protection" product/service to BOA credit card customers.  In exchange for a monthly fee based on a percentage of the outstanding BOA credit card account balance, said product/service will temporarily pay (or cancel) the minimum monthly payment due on the account in the event the gaurantor of the account becomes unable to because of disability, involuntary unemployment, or the like.  Thus the "debt protection" protects BOA's money and the gaurantor's credit score.

Plaintiff David Keck alleges he was the victim of unlawful and deceptive business practices, among other violations, when defendants ostensibly sold him this "debt protection" product/service.  In support of his allegations, he sets forth a transcript of the exchange between him and defendants' telemarketer that formed the basis for defendants' decision to begin charging his account for this product/service.  He explains that, when he complained about erroneous charges to his account, defendants submitted the audio recording of this conversation to him as evidence of the supposed transaction.

## II.    <u>ISSUES PRESENTED AND SUMMARY OF ARGUMENT</u>

BOA's broad challenges to the factual sufficiency of the First Amended Complaint (FAC) are unfounded.  On the contrary, the transcript of the telemarketing sales call provides an unusually detailed account of the alleged wrongful and fraudulent conduct at issue.  The related inferences and allegations are entirely consistent with common experience and understanding.  The pleadings of the FAC satisfy Federal Rules of Procedure (FRCP) Rule 8, as wells as the heightened pleading requirements of FRCP Rule 9(b) to the extent they apply.

The primary legal issue presented is BOA's challenge to the Consumer Legal Remedies Act (Civil Code §§ 1750 *et seq*, the CLRA) claim on the grounds that the CLRA does not apply to financial or insurance services.  This position represents a substantial

1    extension of current California appellate authority, which has found that the legislature did

2    not intend the CLRA to apply to raw extensions of credit.  The issue is currently pending

3    before the California Supreme Court, on appeal from a case supporting BOA's position.

4    The motion to dismiss should not be granted because the better analysis – and the analysis

5    which the Supreme Court is more likely to adopt – would not construe such a gaping,

6    judicially created exception to this important consumer protection law.

7

8    **III.    <u>FACTS</u>**

9         At the time of these events, plaintiff was an elderly and infirm gentleman, living off

10    Social Security benefits of approximately $1200 per month, which were directly deposited

11    into his BOA checking account.  FAC, ¶¶9-10.  He was the guarantor of a BOA credit card

12    account with a balance of about $13,500, money he had borrowed for necessities, and which

13    he was paying off timely despite a marginal interest rate of approximately 25%.  Id., ¶11.

14         Through its banking relationship with plaintiff, BOA developed and maintained a

15    record of demographic information about him (including the fact that he was a senior

16    citizen).  Id., ¶12.  It used this information to, among other things, target him for

17    telemarketing sales efforts, including of the subject debt protection product/service.  Id.,

18    ¶¶14, 21-22.

19         Said product/service is designed to temporarily the pay minimum monthly payment

20    due on a credit card account if the guarantor of the card becomes disabled, involuntary

21    unemployment, or the like.  Id., ¶14.  Although plaintiff remains unaware of the specific

22    conditions for receipt of such benefits, he plausibly alleges that the product/service was

23    extremely unlikely to pay him any significant benefits because of his preexisting status as an

24    unemployed senior citizen living on Social Security. Ibid.

25         In July of 2007, plaintiff received at least two telemarketing calls at his home in San

26    Francisco.  Id., ¶13.  During the latter call the following interaction occurred:

27         TELEMARKETER:  David Keck please.
      KECK:                Speaking.
28

| | | |
|---|---|---|
| 1 | TELEMARKETER: | Mr. Keck good morning sir, my name (incomprehensible) sir. I'm calling on behalf of Bank of America regarding your Bank of America business credit card sir that you have with us. Now Mr. Keck I just want to offer a new optional service here today, it's called the business card security. Now if– |
| 5 | KECK: | Someone called me about that yesterday. |
| | TELEMARKETER: | –Okay, well sir just want to get the materials out to you today sir for 30 days to review in the privacy of your own business. Is that okay? |
| 7 | KECK: | Yes. |
| 9 | TELEMARKETER: | Great sir, now in order to get that out to you today, Mr. Keck, I do have to start the enrollment process today, sir, but you do have 30 days in order to make that decision. Is that okay? |
| 11 | KECK: | Yes. |
| 13 | TELEMARKETER: | Great. Now to complete your enrollment sir, with your permission, for quality assurance purposes, I'd like to tape record the confirmation of your coverage and enrollment, is that okay? |
| 15 | KECK: | Yes. |
| 16 | TELEMARKETER: | Thank you... (incomprehensible) ...I am now taping your enrollment. I show your name as David Keck. Mr. Keck I show you mailing address as 452 Duboce Avenue, Apartment number 210, is that correct? |
| 19 | KECK: | Yes. |
| 20 | TELEMARKETER: | Thank you. I'd also like to confirm I'm speaking with the guarantor of a business credit card with the Bank of America, is that correct? |
| 22 | KECK: | Pardon me? |
| 23 | TELEMARKETER: | I said I would also like to confirm I'm speaking with a guarantor of the business credit card with the Bank of America, is that correct? |
| 25 | KECK: | Yes, I have a - I have a credit card. |
| | TELEMARKETER: | Are you the guarantor sir on that credit Bank of America business credit card? |
| 27 | KECK: | Yes. |

| TELEMARKETER: | Okay, thank you. Now to verify approval (sic) activate this feature for you, you understand this (sic) on a monthly fee of eighty five cents for one hundred dollars a month, your outstanding bill (sic) will be billed to your Bank of America business card account, I need to verify your city of birth sir.  What city were you born in Mr. Keck? |
| KECK: | San Diego. |
| TELEMARKETER: | Okay.  .......Now, Mr.  Keck I will process your enrollment.... |

Ibid.

Plaintiff alleges that the telemarketer conducted the above transaction pursuant to a standardized sales script, procedure, and training program.  Id., ¶18.  As a result of the interaction, plaintiff incurred charges to his credit card account that he did not authorize (at least not intentionally), and interest on those charges at 25% per year.  Id., ¶¶15-16.  When plaintiff contested the charges, defendants gave him the run around with respect to their cause and source.  Id., ¶¶17-18.  The source of the charges – whether they were BOA or vendor charges – remain ambiguous. Ibid.

In addition to the express allegations, plaintiff notes the following factual inferences and indicia of fraud and deception that arise on the face of the subject telemarketing transcript:

1. This appears to be a repeat call, presumably made after Mr. Keck previously declined the same offer.

2. No description is given of the product or service that the telemarketer is selling; rather the telemarketer refers to written materials that he wishes to send to Mr. Keck for review.

3. In indicating that he has to "start the enrollment process", the telemarketer omits that he plans to trigger charges against Mr. Keck's account

4. In indicating that Mr. Keck will have 30 days to make a decision, the telemarketer omits that Mr. Keck's account will be charged if he fails to take affirmative action.

5.  The telemarketer refers to the transaction as an "enrollment" as opposed to a purchase transaction, and intentionally omits references to cost.

6.  The only reference to the monetary charges that Mr. Keck will incur (a) is not clear and conspicuous, (b) does not provide the amount of the charges, (c) does not indicate that the charges will be triggered immediately (as opposed to upon an affirmative decision by Mr. Keck to purchase the service or product to be described in the materials to be sent), and (d) is insidiously buried in a statement by the telemarketer that otherwise would seem to relate to verification of Mr. Keck's agreement to receive materials for review.

7.  The only information affirmatively supplied by Mr. Keck is the city of his birth, which is provided in response to a straightforward request for it, which the telemarketer sets up to be (and then deems to be) authorization to charge Mr. Keck for the debt protection product/service.

## IV.    ARGUMENT

### A.    THE FAC SATISFIES *TWOMBLY* TO THE EXTENT IT APPLIES

The U.S. Supreme Court decision in *Bell Atlantic Corp. vs. Twombly,* 127 S.Ct. 1955 (2007) (*Twombly*) sets the standard for pleading sufficient facts to establish the "contract, combination … or conspiracy" element when allegations of parallel conduct are set out in order to make a Sherman Act claim.  *Id.*, 1961.  In such cases, to plead an entitlement to relief under FRCP Rule 8(a)(2), the evidentiary facts alleged must "plausibly suggest" a "meeting of the minds" regarding the alleged antitrust violations.  *Id.*, 1965-1967.  Facts regarding intentional parallel conduct are considered "neutral" in the absence of facts that "when viewed in light of common economic experience" suggest the conduct was pursuant to an actual agreement.  *Ibid.; Id*, 1971.

Because *Twombly* does not otherwise abrogate the notice pleading standard of FRCP Rule 8(a)(2), its relevance to this case is attenuated at best.  In any case, plaintiff's hard

1    factual allegations plausibly suggest satisfaction of each of the elements of the causes of

2    action he asserts.

3    **B.    PLAINTIFF STATES CLAIMS FOR RELIEF UNDER THE UCL**

4    **1.    Plaintiff States a Claim For Unlawful Practices Based on**
     **Predicate Violations of the Federal Telemarketing and**
5    **Consumer Fraud and Abuse Prevention Law**

6        Plaintiff states a claim under California's Unfair Competition Law (Bus. & Prof.

7    Code §§ 17200 *et seq.*, the UCL) for "unlawful" business practices predicated on violations

8    of the Telemarketing and Consumer Fraud and Abuse Prevention law at Title 15, Chapter 87

9    of the United States Code (the TCFAP law).  15 U.S.C.A. § 6101 *et seq*.  Defendant BOA

10   avers that section 6102 of the TCFAP law does not itself prohibit deceptive or abusive

11   practices, but merely directs the Federal Trade Commission (FTC) to propagate rules to do

12   so.  This is not a salient distinction because the complaint alleges violations of the TCFAP

13   law *as a whole*, as well as legislatively *mandated* rules therein.  E.g., 15 U.S.C.A. §

14   6102(a)(3)(C) ["The Commission ***shall*** include in such rules…*** the requirement that any

15   person engaged in telemarketing … shall promptly and clearly disclose to the person

16   receiving the call that the purpose of the call … and ... including the nature and price of the

17   goods and services"] (emphasis added).

18       Direct reference to the TCFAP regulations only bolsters plaintiff's unlawful business

19   practices UCL claim. 16 C.F.R. § 310.1 *et seq.*; see *Smith v. Wells Fargo Bank, N.A.* 135

20   Cal.App.4th 1463, 1480 (2005) (violation of a federal law or regulation may serve as a

21   predicate for a UCL action).  Several of these regulations apply generally to require

22   telemarketers to present truthful, clear, and conspicuous information regarding the nature

23   and cost of the goods or services offered, while also prohibiting false or misleading

24   statements. 16 C.F.R. § 310.3(a)(1) & (4); 16 C.F.R. § 310.4(d).  The transcript of the

25   telemarketing call alleges sufficient facts to state a predicate claim that defendants' agents

26   violated these regulations.

27       Moreover, the gravamen of plaintiff's UCL claim is that defendants' telemarketing

28   sales script and tactics did not intend or result in actual informed consent to purchase the

debt protection product/service.  As it happens, the TCFAP regulations provides specific

safeguards against these precise practices:

> (a) It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:***
>
> > (6) Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer ... ***In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer … to be charged for the goods or services … and to be charged using the identified account***. ***In any telemarketing transaction involving preacquired account information[1], the [following] requirements must be met to evidence express informed consent.***
> >
> > > (i) In any telemarketing transaction involving preacquired account information and a free-to-pay conversion[2] feature, the seller or telemarketer must:
> > >
> > > > (A) obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;
> > > >
> > > > (B) obtain from the customer his or her express agreement to be charged for the goods or services and to be charged using the account number pursuant to paragraph (a)(6)(i)(A) of this section; and,
> > > >
> > > > (C) make and maintain an audio recording of the entire telemarketing transaction.

16 C.F.R. § 310.4(a)(6)  (emphasis added)

　　　　In this case, where the telemarketed product/sevice involved a "free-to-pay conversion" feature and "preacquired account information," defendants committed a *per se* violation by failing to have plaintiff *affirmatively* provide the last four digits of his account to be charged and failing to obtain his express agreement to charge that particular account.

---

[1] "Preacquired account information means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged."  16 C.F.R. § 310.2(w).

[2] "Free-to-pay conversion means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period."  16 C.F.R. § 310.2(o).

1    16 C.F.R. § 310.4(a)(6)(i)(A)&(B).  In any event, whether one looks at the TCFAP statute

2    or implementing regulations or both, it is clear that the FAC sufficiently states plaintiff's

3    entitlement to relief based on an UCL unlawful practices claim predicated thereon.

**2.    Plaintiff States a Claim For Unfair Practices Based On The Legislative Policy Against Fraudulent And Abusive Telemarketing Practices**

Even if, strictly speaking, no law or regulation was violated, plaintiff states a claim

that defendants' telemarketing practices are "unfair" under the UCL based on the

legislatively declared policy expressed in connection with the TCFAP law because the harm

caused by defendants' practices is not outweighed by any apparent legitimate utility.  12

U.S.C.A § 6101 (Congressional Findings)[3];  *Lozano v. AT & T Wireless Services, Inc.*, 504

F.3d 718, 736 (9th Cir. 2007) (*Lozano*).  The rationale behind the broad sweep of the

"unfair" prong of the UCL is to "enable judicial tribunals to deal with the innumerable new

schemes which the fertility of man's invention would contrive."  *Cel-Tech Communications,*

*Inc. v. Los Angeles Cellular Telephone Co.* 20 Cal.4th 163, 181 (1999) (*Cel-Tech*).

Whatever ambiguity may currently exist regarding how to define "unfair" in the *consumer*

UCL context after *Cel-Tech*, the "unfair prong" of the UCL plainly applies to fill technical

gaps in a legal scheme that evinces a strong legislative policy against the misconduct at

issue.  *Lozano*, 735.

In *Lazano*, the Ninth Circuit adopted a standard that considers both (1) the

connection between the allegedly unfair conduct and any legislatively declared policy

relating to it and (2) the utility of the allegedly unfair conduct weighed against the harm to

the consumer.  *Id.*, 735.  It approved *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144 (2000)

---

[3] "The Congress makes the following findings: (1) Telemarketing differs from other sales activities in that it can be carried out by sellers across State lines without direct contact with the consumer. Telemarketers also can be very mobile, easily moving from State to State. (2) Interstate telemarketing fraud has become a problem of such magnitude that the resources of the Federal Trade Commission are not sufficient to ensure adequate consumer protection from such fraud. (3) Consumers and others are estimated to lose $40 billion a year in telemarketing fraud. (4) Consumers are victimized by other forms of telemarketing deception and abuse. (5) Consequently, Congress should enact legislation that will offer consumers necessary protection from telemarketing deception and abuse." 12 U.S.C.A § 6101.

(*Schnall*), wherein the relevant law prohibited rental car companies from mandating charges other than "the rental rate, taxes, and a mileage charge" as a condition of rental, but allowed optional charges provided the "renter could have avoided incurring" them. *Id.*, 1155. *Schnall* held that, although the law plainly allowed rental car companies to offer optional services, it also evinced a legislative policy against "unavoidable" extraneous charges. *Id.*, 1163. That policy supported a claim that potentially deceptive disclosures regarding refueling charges could constitute unfair practices under the UCL. *Ibid.* Insofar as the defendant's justifications for the deceptive disclosures were not apparent on the face of the complaint, determination of whether the utility of defendant's conduct outweighed the harm to the alleged victim was a question of fact. *Ibid.*

Here we have a situation where defendants used extremely sharp and aggressive telemarketing practices to obtain the ostensible consent of an elderly citizen to purchase an insurance-like product that he had no use for. Assuming *arguendo* that defendants' conduct did not involve an actual violation of the TCFAP law or regulations, it still involved a violation of the public policy underlying that law. Because defendants' justification, if any, for these practices is not apparent, the FAC states a claim for unfair practices.

### 3. Plaintiff States a Claim For Fraudulent Practices and False Advertising Based On The Telemarketing Sales Script

BOA challenges plaintiff's claim for fraudulent practices and false advertising[4] based on the heightened pleading standard of FRCP Rule 9(b), which states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

FRCP Rule 9(b).

Here, plaintiff provides a near verbatim transcript of the circumstances underlying his claim. It is hard to imagine providing more raw factual detail in the area of concern to

---

[4] False advertising includes unfair, deceptive, untrue or misleading advertising as defined in Business & Professions Code §§ 17500 *et seq.*, as incorporated into Business & Professions Code §§ 17200 *et seq.* in the statutory scheme.

1   Rule 9(b).  Accordingly, the allegations plainly satisfy Rule 9(b), and states the requisite

2   claims.

3       **C.     PLAINTIFF STATES A CLAIM FOR INVASION OF PRIVACY
            BECAUSE IT IS ILLEGAL TO RECORD A TELEPHONE CALL IN**
4           **CALIFORNIA WITHOUT *FIRST* INFORMING ALL THE PARTIES**
            **TO THE CALL**
5

6           It is now very well established that section 632 of the California Penal Code

7   prohibits a party from "recording [any telephone] conversation without first informing all

8   parties to the conversation that the conversation is being recorded."  *Kearney v. Salomon*

9   *Smith Barney, Inc.,* 39 Cal.4th 95, 117 (2006); *Flanagan v. Flanagan*, 27 Cal.4th 766, 772-

10  777 (2002) (*Flanagan*).  BOA's assertion that plaintiff fails to allege the conversation was

11  "confidential" under section 632 lacks merit post-*Flanagan*.  The California Supreme Court

12  has twice recently explained that this statutory scheme "protects against intentional,

13  nonconsensual recording of telephone conversations regardless of the content of the

14  conversation" *Flanagan*, 776; *Kearny*, 117 FN7.

15          BOA next contends that a statement of consent that plaintiff gave mid-way through

16  the conversations satisfies section 632.   This contention fails because the consent was

17  plainly prospective in nature.  FAC, ¶13 ("TELEMARKETER: Now to complete your

18  enrollment sir … I'd like to tape record the confirmation of your coverage and enrollment,

19  is that okay? KECK: Yes. TELEMARKETER: Thank you ... I am now taping").  Because

20  the telemarketer did not tell plaintiff that the prior dialogue was recorded, plaintiff could not

21  have consented to it after-the-fact, or otherwise waived something he did not know about.

22  *City of Ukiah v. Fones*, 64 Cal.2d 104, 107–108 (1966) ("Waiver is the intentional

23  relinquishment of a known right after knowledge of the facts … [t]he burden … is on the

24  party claiming a waiver").

25      **D.     PLAINTIFF STATES A CLAIM FOR RELIEF UNDER THE CLRA**

26          **1.     The CLRA Applies Because This Transaction Involved Personal
                    Services**
27

28          The CLRA applies to this transaction because the financial services involved were

    intrinsically personal in nature.  The CLRA proscribes certain "practices undertaken … in a

---

PLAINTIFF'S OPPOSITION TO DEF. BANK
                                       OF AMERICA'S MOTION TO DISMISS FAC
                                       CASE NO. CV 08-1219 CRB

1   transaction intended to result … in the sale … of … services to any consumer".  Civil

2   Code § 1770(a).  "Services" as used in the CLRA "means work, labor, and services for other

3   than a commercial or business use".  Id., § 1761(b).  "Consumer" as defined in the CLRA

4   "means an individual who seeks or acquires … any … services for personal, family, or

5   household purposes."  Id., § 1761(d).  The CLRA is to "be liberally construed and applied to

6   promote its underlying purposes, which are to protect consumers against unfair and

7   deceptive business practices".  Id., § 1760.

8         BOA contends that the subject transaction falls outside of the CLRA because it

9   involved a "business" credit card.  The question presented, however, is whether as a matter

10  of law the *service* was for "commercial or business use," as opposed to "personal, family, or

11  household purposes".  Id., § 1761(b)&(d).  The FAC more than plausibly suggests it was

12  not.  First, the service was not sold to any business entity but to the "guarantor" of a credit

13  card.  Second, the telemarketer did not ask for the business, but for Mr. Keck personally.

14  Third, the telemarketer called Mr. Keck at home.  Most importantly, the service at issue here

15  is intrinsically personal because it is designed to pay (or cancel) minimum monthly

16  payments under intrinsically personal conditions such as disability, involuntary

17  unemployment, and the like.  Businesses do not themselves become disabled or

18  unemployed.

19           **2.  The CLRA Applies To The Subject Financial Services Transaction**

20        The CLRA applies here because this case involves a financial service transaction

21  other than the raw extension of credit.  *Knox v. Ameriquest Mortgage Co.*, 2005 WL

22  1910927, 4 (N.D.Cal.2005) ("California courts generally find financial transactions to be

23  subject to the CLRA").  It is thus a different case than *Berry v. American Express*

24  *Publishing, Inc*. 147 Cal.App.4th 224 (2007) (*Berry*), which involved only a raw extension

25  of credit.

26        In *Berry*, the plaintiff used the CLRA to challenge the arbitration provision in a

27  credit cardholder agreement.  *Id.*, 226.  *Berry* construed the transaction as the issuance of the

28  credit card – an extension of credit – and held that "neither the express text of CLRA nor its

1  legislative history supports the notion that credit transactions separate and apart from any

2  sale or lease of goods or services are covered under the act". *Id.,* 233.  The reasoning of

3  *Berry* is directly tied to the fact that that transaction was unrelated to the provision of any

4  services:

5        Here, the Legislature's deletion of the terms " money" and "credit" from
        CLRA's definition of "consumer" strongly counsels us not to stretch the
6        provision to include extensions of credit *unrelated to the purchase of any*
        *specific good or service.*
7

8  *Id.*, 231 (emphasis added).

9        The cases which followed *Berry* as precedent also involved similarly raw extensions

10 of credit.   *Van Slyke v. Capital One Bank,* 503 F.Supp.2d 1353, 1358 (N.D.Cal.2007)

11 (CLRA challenge to overlimit fees on credit card credit line); *Augustine v. FIA Card Servs.,*

12 *N.A.* 485 F.Supp.2d 1172, 1175 (E.D.Cal.2007) (CLRA challenge to retroactive rate

13 increases on credit card credit lines).

14       On the other hand, the decisions examining the issue have found no basis to interpret

15 *Berry* to preclude application of the CLRA to financial service transactions in general.[5]

16 *Herrnandez v. Hilltop Financial Mortg., Inc.,* 2007 WL 3101250, 6 (N.D.Cal.2007)

17 (*Herrnandez*);  *Jefferson v. Chase Home Finance LLC*, 2007 WL 1302984 (N.D.Cal. 2007)

18 (*Jefferson*).   *Hernandez* and *Jefferson* both distinguished *Berry* on this basis*,* and found that

19 the CLRA applies to mortgage loan transactions precisely because the transactions involved

20 provision of financial services above and beyond the extension of credit.  Like *Knox v.*

21 *Ameriquest Mortgage Co.*, *supra,* both of these cases found that the weight of California

22 authority holds financial services transactions to be covered by the CLRA. See *Kagan*

23 *v.Gibraltar Sav. & Loan Ass'n*, 35 Cal.3d 582, 596-97 (1984) (applying the CLRA to claims

24 regarding management fees in connection with individual retirement accounts); *Corbett v.*

25 *Hayward Dodge, Inc.*, 119 Cal.App.4th 915 (2004) (applying the CLRA to automobile

26 loans).

27 ───────────────

28 [5] *Fairbanks v. Superior Court,* 154 Cal.App.4th 435 (2007) found that the CLRA does not
apply to insurance transactions, but review granted and opinion superseded at *Fairbanks v.*
*Superior Court,* 171 P.3d 1 (Cal. Nov 14, 2007) (NO. S157001)

1    In this context, this Court should apply "California law as [it] believe[s] the California

2    Supreme Court would apply it." *In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922, 924 (9th

3    Cir.2000).   Insofar as the plain language of the CLRA would seem to cover the financial

4    services transaction at issue here, the question presented is whether the legislative intent was

5    to the contrary.  Early drafts of the CLRA defined "consumer" as "an individual who seeks

6    or acquires, by purchase or lease, any goods, services, *money, or credit* for personal, family

7    or household purposes." *Berry*, 230 (citing Assem. Bill No. 292 (1970 Reg. Sess.) Jan. 21,

8    1970) (emphasis added).  The legislature's unexplained deletion of the words "money" and

9    "credit" from the final draft of the CLRA is the primary rationale for the *Berry* decision. *Id.*,

10    231; *Hernandez*, 5 FN6.

11    Even assuming the significance of these deletions, however, does not suggest the

12    same outcome in this case because Mr. Keck did not acquire money or credit in the subject

13    transaction as occurred in *Berry*.  The better indicator of legislative intent is the policy in

14    favor of liberal construction of the CLRA –  "to protect consumers against unfair and

15    deceptive business practices" – expressed at section 1760 of the Civil Code.

16    Further, construction of the term "consumer" or "services" to exclude financial

17    services is inconsistent with other provisions of the CLRA.  It would, for example, negate

18    section 1770(23)(b), which prohibits "a mortgage broker or lender … [from using] a home

19    improvement contractor to negotiate the terms of any loan…".  Civil Code § 1770(23)(b).

20    And the fact that the legislature created wholesale exemptions to the CLRA for certain real

21    estate and advertising services (at sections 1754 and 1755, respectively) strongly suggests

22    that it would have done so for financial and/or insurance services if it so desired.

23    Accordingly, especially given the standard of review on a Rule 12 motion, and that

24    this issue is now under review by the California Supreme Court in *Fairbanks v. Superior*

25    *Court,* dismissal of the CLRA claim on these grounds is not appropriate.

26    ### 3.  **Defendants Committed Practices Proscribed By The CLRA**

27    Plaintiff's CLRA claims fall into three categories.  First, the telemarketer tricked him

28    into signing up for a debt protection service he did not want or need by indicating that he

1  would be sent materials out "to review" without charge and hiding the financial

2  ramifications of his acquiescence.  Especially when viewed through the legislative directive

3  to promote consumer protection, this conduct violated sections 1770(a)(13) ("false or

4  misleading statements of fact concerning reasons for, existence of, or amounts of price

5  reductions") and 1770(a)(14) ("Representing that a transaction confers or involves rights,

6  remedies, or obligations which it does not have").

7        Second, when he discovered the unauthorized charges, plaintiff was subject to

8  misrepresentations regarding the source of the charges as between the defendants.  FAC,

9  ¶16-17.  When he complained to BOA, they told him to "contact the vendor." Ibid.  It later

10  emerged that the vendor was some sort of partnership between BOA and other defendants.

11  FAC, ¶12  (The specific arrangement between the defendants is unknown to plaintiff.) [6]

12  Plaintiff suffered damages as a result of this conduct because it delayed cancellation of the

13  service while plaintiff was paying BOA daily interest on the debt protection service fees

14  charged to his account.  FAC, ¶23.  These allegations support claims for violations of

15  sections 1770(a)(2) ("Misrepresenting the source … of goods or services"), 1770(a)(3)

16  ("Misrepresenting the affiliation, connection, or association with … another"), and

17  1770(a)(5)("Representing that … a person [as defined to include defendants] has a

18  sponsorship, approval, status, affiliation, or connection which he or she does not have").

19        Third, it is alleged that the debt protection service would not pay plaintiff benefits in

20  any case because he was already unemployed and on Social Security at the time he

21  ostensibly signed up for it, but that plaintiff was targeted for the telemarketing effort based

22  on demographic factors including his age.  FAC, ¶¶14, 21.  These allegations support claims

23  for violations of sections 1770(a)(7) ("Representing that … services are of a particular

24  standard, quality, or grade … if they are of another"), 1770(a)(14) ("Representing that a

25  _____

26  [6] Defendant CENTRAL STATES INDEMNITY CO. OF OMAHA promotes itself as having
    "over 25 years of experience building successful Credit Card Credit Insurance Programs for
27  Credit Card Issuers."   http://www.csi-omaha.com/product.htm.  Plaintiff alleges that it is the
    principal of defendant CSI PROCESSING LLC, which is also the agent of BOA.
28

1    transaction confers or involves rights, remedies, or obligations which it does not have"), and

2    1770(a)(18) ("Inserting an unconscionable provision in the contract").  Plaintiff was

3    damaged as a result because he paid for the right to benefits he could not receive.

4    ### E.    PLAINTIFF STATES A CLAIM FOR FINANCIAL ELDER ABUSE

5    In the fourth cause of action, plaintiff incorporates the prior allegations and alleges

6    that he is an "elder" as that term is defined in the Elder Abuse and Dependent Adult Civil

7    Protection Act (the Act) and that defendants appropriated and retained his money

8    wrongfully and/or with the intent to defraud and/or assisted in doing the same, and, thus,

9    committed financial elder abuse as that term is defined in section 15610.30 of the Act. Welf.

10   & Inst. §§ 15600 *et seq.*  He seeks the remedies available therefore pursuant to Article 8.5

11   ("Civil Actions for Abuse of Elderly or Dependent Adults"), Section 15657.5 ("Attorney's

12   fees and costs; defendant liable for financial abuse; limits on damages; punitive damages")

13   of the Act.[7]   These pleadings would seem to state a claim for relief under the Act.  *Intrieri*

14   *v. Superior Court*, 117 Cal.App. 4th 72, 82 (2004) ("[t]he elements of a cause of action

15   under the … Elder Abuse Act ... are statutory..."); *Negrete v. Fidelity and Guar. Life Ins.*

16   *Co.,* 444 F.Supp.2d 998, 1002-03 (C.D.Cal.2006) (*Negrete*) (allegations regarding deceptive

17   practices in the sale of annuities to elders state claim for Financial Elder Abuse cause of

18   action).

19   BOA's assertion that there is no such thing as a stand-alone Elder Abuse cause of

20   action lacks merit.  The most recent case it cites in support of this assertion is *Wolk v. Green,*

21   516 F.Supp.2d 1121 (N.D.Cal.2007), which involved an attorney's alleged misappropriation

22

23   [7]  Section 15657.5 reads:
24       (a) Where it is proven by a preponderance of the evidence that a defendant is
         liable for financial abuse, as defined in Section 15610.30, in addition to all
25       other remedies otherwise provided by law, the court shall award to the plaintiff
         reasonable attorney's fees and costs…
26       (b) … and where it is proven by clear and convincing evidence that the
27       defendant has been guilty of recklessness, oppression, fraud, or malice in the
         commission of the abuse, in addition to reasonable attorney's fees and costs set
28       forth in subdivision (a), and all other remedies otherwise provided by law, the
         following shall apply…

PLAINTIFF'S OPPOSITION TO DEF. BANK
OF AMERICA'S MOTION TO DISMISS FAC
CASE NO. CV 08-1219 CRB

of money from his elder client.  In that case, the District Court *initially* found that the Act was inapplicable, but upon reconsideration admitted error and *restored* the Elder Abuse cause of action, explaining:

> Several courts have held that this California statute creates a civil cause of action for elder financial abuse. See *Genton v. Vestin Realty Mortgage II*, Inc., 2007 WL 951838, at *2 (S.D.Cal.). Defendant's arguments that plaintiff's claim must fail because she is not a "dependant" adult, and because payments made to an attorney for services rendered cannot constitute "taking" or "appropriation", do not find clear support in the statute or relevant case law. Cf. Cal. Welf. And Inst.Code § 15610.23 (defining "dependant adult") with § 15610.30 (defining "elder"); see, e.g., *Negrete*, 444 F.Supp.2d at 1002-03 (holding that plaintiff sufficiently pleaded elder abuse by alleging that the defendant investment firm took or appropriated her funds by use of a fraudulent scheme). *** …I cannot conclude as a matter of law that this cause of action cannot exist against defendant.

*Id.,* 1136-37.

Nor do the other two cases upon which BOA relies – *Berkley v. Dowds*, 152 Cal.App.4th 518 (2007) (*Berkley*) and *ARA Living Centers-Pacific, Inc. v. Superior Court,* 18 Cal.App.4th 1556 (1993) (*ARA*) – support its position.  The former cites the latter for the following sentence: "The [Elder Abuse] Act does not create a cause of action as such, but provides for attorney fees, costs and punitive damages under certain conditions." *Berkley,* 529.  This is dicta, however, because *Berkley* found that the underlying factual allegations as a whole "failed to show any harmful conduct by respondent or any injury as a result of any acts of respondent." *Berkley,* 529.  On that basis, *Berkley* affirmed dismissal of an entire cross-complaint by general demurrer. *Id.*, 535.

The basis for *Berkley*'s aforementioned citation to *ARA* is not entirely clear.  In *ARA*, the question presented was whether the 1991 amendments to the Act should be applied retrospectively to physical elder abuse cases.  *ARA*, 1558.  Discussion of "causes of action" arose because of the defense contention that "applying the new statute would be a retroactive application of law because it created a cause of action for elder abuse." *Id.*, 1563. *ARA* concluded that no new cause of action for physical elder abuse was created in 1991 because that cause of action already existed by virtue of the original elder abuse legislation.

1    *Id.*, 1563-64.  However, because ARA found aspects of the 1991 amendments substantial

2    enough that they could not be applied retroactively, it ultimately held that although the Act's

3    provision for attorney fees applied retrospectively, "the lifting of the limitation on pain and

4    suffering damages may be applied prospectively only." *Id.*, 1558, 1564-65.

5        The bottom line is that BOA's legal arguments and the case they cite do not support

6    dismissal here.  In this case, as in *Negrete*, plaintiff alleges that he was targeted as an elder

7    and subjected to deceptive practices to sell him an insurance product that provided him little

8    or no benefits because of his situation as an elder.  *Id.*, 1000.  As in *Negrete*, plaintiff states

9    a claim for financial elder abuse because the factual allegations are sufficient to suggest that

10   the taking  and retention of his money fits the definition of financial elder abuse at 15610.30

11   of the Act. *Negrete*, 1001-02.

12       **F.     PLAINTIFF STATES A CLAIM FOR UNJUST ENRICHMENT**

13       BOA's assertion that unjust enrichment is not a stand-alone cause of action is

14   directly contrary to the recent California Supreme Court authority in *Ghirardo v.*

15   *Antonioli*,14 Cal.4th 39, 44 (Cal. 1996), which held that "[t]he seller in this matter pleaded

16   and proved a cause of action based on a theory of unjust enrichment."  The source of the

17   assertion is a line of case law that notes that "[t]he phrase 'Unjust Enrichment' ... is

18   synonymous with restitution." *Melchior v. New Line Productions, Inc.,* 106 Cal.App.4th

19   779, 793 (2003).  This is ultimately a distinction without a difference, however, because

20   none of the cases BOA cites stand for its proposition that a cause of action for unjust

21   enrichment – i.e. a claim for restitution based on unjust enrichment –  must be predicated on

22   some additional distinct theory of recovery.  *Melchior, surpra,* 793 ("[s]ince Melchior's

23   cause of action for unjust enrichment has the same basis as his cause of action for

24   conversion, the Copyright Act also preempts it."); *Lauriedale Associates, Ltd. v. Wilson,* 7

25   Cal.App.4th 1439, 1449 (1992) ("restitution will be denied where application of the doctrine

26   would involve a violation or frustration of the law or opposition to public policy").

27       "Unjust Enrichment" describes the "result of a failure to make restitution under

28   circumstances where it is equitable to do so."  *Lauriedale Associates, Ltd., supra*, 1448.

CRITICAL

1
2
3
4
5
6

> Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another. (Rest., Restitution, § 1, p. 12.) A person is enriched if he receives a benefit at another's expense. (Id., com. a, p. 12.) The term "benefit" "denotes any form of advantage." (Id., com. b, p. 12.)  Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss. Even when a person has received a benefit from another, he is required to make restitution "only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." (Id., com. c, p. 13.)

7   *Ghirardo v. Antonioli*, supra, 51.

8        The question presented at this stage is simply whether plaintiff might be entitled to

9   restitution of benefits obtained from him as a result of the purported transaction.  Because

10  defendants charged his account without his authorization (or, alternatively, used deception to

11  obtain his authorization) he is certainly entitled to a refund of these charges and any resulting

12  charges (i.e. interest payments thereon) because it would be unjust to allow defendants to

13  keep them.

14

15  **V.    CONCLUSION**

16        For the foregoing reasons, BOA's motion to dismiss should be denied.

17

18  Dated:  March 27, 2008                    BRAYTON PURCELL LLP

19

20                                      By:  /s/ Peter Fredman
21                                           Peter B. Fredman
22                                           Attorneys for Plaintiffs

23

24

25

26

27

28