1  MARK JOSEPH KENNEY (State Bar No. 87345)
   mjk@severson.com
2  JAN T. CHILTON (State Bar No. 47582)
   jtc@severson.com
3  JOSHUA E. WHITEHAIR (State Bar No. 244900)
   jew@severson.com
4  SEVERSON & WERSON
   A Professional Corporation
5  One Embarcadero Center, Suite 2600
   San Francisco, CA  94111
6  Telephone:  (415) 398-3344
   Facsimile:  (415) 956-0439
7
   Attorneys for Defendant
8  Bank of America, N.A.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  DAVID KECK, an individual,              Case No.:  CV 08-1219 CRB

13            Plaintiff,                    **REPLY MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN SUPPORT OF
14       vs.                                BANK OF AMERICA'S MOTION TO
                                            DISMISS FIRST AMENDED
15  BANK OF AMERICA, a Delaware             COMPLAINT**
    Corporation; CENTRAL STATES
16  INDEMNITY CO. OF OMAHA, a Nebraska      Hearing Date:    April 18, 2008
    Corporation; CSI PROCESSING, LLC, a     Time:            10:00 a.m.
17  Nebraska Company, and DOES 1 through 100, Courtroom:       8
                                            Judge:           Hon. Charles R. Breyer
18            Defendants.
                                            Complaint Date:  December 17, 2007
19  ─────────────────────────────────      Trial Date:  Not Set

20                                          Accompanying Document:  Request for
                                            Judicial Notice
21

22

23

24

25

26

27

28

TABLE OF CONTENTS

*Page*

I.     THE COMPLAINT DOES NOT SATISFY
       APPLICABLE PLEADING STANDARDS ...................................................................1

II.    KECK STATES NO UCL CLAIM ...................................................................2

III.   KECK DOES NOT ALLEGE A VIOLATION
       OF PENAL CODE SECTION 632 ...................................................................3

IV.    KECK HAS NOT ALLEGED A CLRA CLAIM ...................................................................4

       A.    The CLRA Does Not Apply To This Transaction ...................................................................4

             1.    The CLRA Does Not Apply To A Business Card Service ...................................................................4

             2.    The CLRA Does Not Extend To
                   Debt Cancellation Or Suspension ...................................................................5

       B.    Keck Does Not Allege A CLRA Violation To Rule 9(b) Standards ...................................................................7

V.     ELDER ABUSE IS NOT A SEPARATE CAUSE OF ACTION ...................................................................9

VI.    KECK ALLEGES NO CLAIM FOR UNJUST ENRICHMENT ...................................................................10

VII.   CONCLUSION ...................................................................11

10597/0056/664896.1

Reply Memo i/s/o Motion to Dismiss
Case No.: CV 08-1219 CRB

## TABLE OF AUTHORITIES

*Page(s)*

1    *Cases*

2    Bardin v. Daimlerchrysler Corp.,
        136 Cal.App.4th 1255, 39 Cal.Rptr.3d 634 (2006) .......................................... 8

3
     Bell Atlantic Co. v. Twombly, ___ U.S. ___, 127 S.Ct. 1955 (2007) ..................... 1

4
     Berkley v. Dowds, 152 Cal.App.4th 518, 61 Cal.Rptr.3d 304 (2007) .................... 9, 10

5
     Berryman v. Merit Property Management, Inc.,
6        152 Cal.App.4th 1544, 62 Cal.Rptr.3d 177 (2007) ...................................... 11

7    Berry v. American Express Pub., Inc.,
        147 Cal.App.4th 224, 54 Cal. Rptr.3d 91 (2007) ........................................ 5, 6

8
     Daugherty v. American Honda Motor Co.,
9        144 Cal.App.4th 824, 51 Cal.Rptr.3d 118 (2006) ........................................ 8

10   Dinjian v. Dinjian, 22 Mass.App.Ct. 589, 495 N.E.2d 882 (1985) .......................... 4

11   Falk v. General Motors Corp., 496 F.Supp.2d 1088 (N.D. Cal. 2007) ................... 10-11

12   Flanagan v. Flanagan, 27 Cal.4th 766, 772, 41 P.3d 575 (2002) .......................... 3

13   Genton v. Vestin Realty Mortg. II, Inc., 2007 WL 951838 (S.D. Cal. 2007) ............... 10

14   Hernandez v. Hilltop Fin. Mortg., Inc., 2007 WL 3101250 (N.D. Cal. 2007).............. 6

15   In re Glenfed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir.1994) (en banc) ................. 2

16   In re Late Fee & Over-Limit Fee Litig., 528 F.Supp.2d 953 (N.D. Cal. 2007) ........ 5, 9, 11

17   Intrieri v. Superior Court, 117 Cal.App.4th 72, 12 Cal.Rptr.3d 97 (2004)................ 10

18   Jefferson v. Chase Home Fin. LLC, 2007 WL 1302984 (N.D. Cal. 2007) ................... 6

19   Mendiondo v. Centinela Hospital Medical Center,
        No. 06-55981, 2008 WL 852186 (9th Cir. April 1, 2008) ................................. 1
20
     Minnesota ex rel. Hatch v. Fleet Mortg. Corp.,
21       181 F.Supp.2d 995 (D. Minn. 2001) ..................................................... 2

22   Morris v. BMW of N. Am., LLC, 2007 WL 3342612 (N.D. Cal. 2007)...................... 1-2, 7

23   Negrete v. Fidelity & Guar. Life Ins. Co., 444 F.Supp.2d 998 (C.D. Cal. 2006)............ 10

24   Rose v. Chase Bank USA, N.A., 513 F.3d 1032 (9th Cir. 2008)............................ 3, 9

25   Ryman v. Sears, Roebuck & Co., 505 F.3d 993 (9th Cir. 2007) .......................... 6, 10

26   Smith v. Wells Fargo Bank, N.A.,
        135 Cal.App.4th 1463, 38 Cal.Rptr.3d 653 (2005) ...................................... 2
27
     Southern Cal. Ch. of Associated Builders etc. Com. v. California Apprenticeship
28       Council, 4 Cal.4th 422, 841 P.2d 1011 (1992)........................................... 10

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Wolk v. Green*, 516 F.Supp.2d 1121 (N.D. Cal. 2007)..................................................... 10

*Statutes, Rules, Regulations*

United States Code
    Title 15
        Section 41 .......................................................................................... 2
        Section 45 .......................................................................................... 2
        Section 6101 ...................................................................................... 2
        Section 6105 ...................................................................................... 2

Code of Federal Regulations
    Title 12
        Section 7.4008 ............................................................................... 3, 9
        Section 7.4009 ............................................................................... 3, 9
        Part 37 ............................................................................................... 5
        Section 37.1 ...................................................................................... 5
        Section 37.2 ...................................................................................... 6
        Section 37.3 ...................................................................................... 5
        Section 37.6 ...................................................................................... 5
        Part 37, Appendix A ......................................................................... 5
        Part 37, Appendix B ......................................................................... 5
    Title 16
        Section 310.4 .................................................................................... 2

Federal Rules of Civil Procedure
    Rule 8 ...................................................................................................... 1
    Rule 9 ............................................................................................ 1, 7, 10

California Civil Code
    Section 1761 ........................................................................................... 4
    Section 1770 ................................................................................... 6, 8, 9

California Penal Code
    Section 632 ............................................................................................. 3

California Welfare and Institutions Code
    Section 15610.30 .................................................................................. 10

California Statutes 1996, chapter 684 .................................................................... 6

*Other Authorities*

Richard C. Bennett, et al., Business Insurance Law
    & Practice Guide (Mathew Bender 2007)
    Volume 2, section 12.04 ......................................................................... 5

- iii -

# I.

## THE COMPLAINT DOES NOT SATISFY APPLICABLE PLEADING STANDARDS

Contrary to Keck's suggestion (Opp., 5-6), his complaint does not meet federal pleading standards. Those portions of the complaint that do *not* allege fraud claims must meet Rule 8(a) standards. Contrary to Keck's argument (Opp., 5), the Supreme Court's recent *Twombly* decision explicates that standard for all pleadings, not just those alleging antitrust conspiracies. To quote a recent Ninth Circuit case alleging retaliation against an employee for pursuing a False Claims Act suit:

> Where, as here, the heightened pleading standard of Rule 9(b) does not apply, the complaint "need only satisfy the Rule 8(a) notice pleading standard . . . to survive a Rule 12(b)(6) dismissal." The complaint need not contain detailed factual allegations, but it must provide more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Under Rule 8(a), the plaintiff must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 1964 (internal citation and quotation marks omitted).

*Mendiondo v. Centinela Hospital Medical Center*, No. 06-55981, 2008 WL 852186 at *4 (9th Cir. April 1, 2008) (citation omitted).

Keck's complaint does not meet Rule 8(a) standards, as explicated in *Twombly*, because it provides no bridge between the evidentiary facts alleged in paragraph 13 regarding the telemarketer's call and the legal conclusions and claims which fill the remainder of the pleading. Keck's opposition memorandum illustrates this difficulty, repeatedly revealing for the first time the nature of the particular violations he claims. For example, Keck's complaint nowhere reveals that his UCL claim is based on the fact that the telemarketer did not ask Keck for the last four digits of his account number. (See Opp., 6-8.)

Keck also fails to mention, thereby tacitly conceding, that much of his complaint alleges claims that are subject to Rule 9(b)'s more stringent pleading requirements—most particularly, his claims for violation of the UCL's "fraudulent business act or practice" prong, the CLRA, and the Elder Abuse Act. Contrary to Keck's contention (Opp., 9-10), simply reciting verbatim his conversation with the telemarketer does not satisfy Rule 9(b). Instead, the complaint must also provide "an explanation of how or why such statements are false or misleading." *Morris v. BMW*

1  *of N. Am., LLC*, 2007 WL 3342612 at *3 (N.D. Cal. 2007), citing *In re Glenfed, Inc. Sec. Litig.*,

2  42 F.3d 1541, 1547-48 n. 7 (9th Cir.1994) (en banc).  Keck's complaint alleges no such

3  explanation.  Explanations given only in Keck's opposition memorandum do not cure the defects

4  in his complaint.

5  <center>**II.**</center>

6  <center>**KECK STATES NO UCL CLAIM**</center>

7       Keck's opposition memorandum reveals for the first time that his UCL "unlawful"

8  practice claim against BofA is based solely on the telemarketer's failure to ask Keck to provide

9  the last four digits of his account number.  (Opp., 6-8.)  According to Keck, this failure violated

10 the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. §310.4(a)(6)(i)(A).

11      Keck is wrong because the TSR does not apply to national banks.

12          [T]he FTC has jurisdiction over non-banks, but no authority to
            enforce the Federal Trade Commission Act … against banks as a
13          result of the bank exclusion language of 15 U.S.C. §45(a)(2).[1]
            Thus, under 15 U.S.C. §6105(a),[2] the TSR does not apply to
14          regulate the activities of entities such as banks which are beyond
            the jurisdiction of the FTC Act.
15

16 *Minnesota ex rel. Hatch v. Fleet Mortg. Corp.*, 181 F.Supp.2d 995, 997 (D. Minn. 2001) (fn.

17 omitted).

18      Keck has also not stated a claim against BofA under the UCL's "unfair" or "fraudulent"

19 practice prongs.  The very case Keck cites (*see* Opp., 6, *citing Smith v. Wells Fargo Bank, N.A.*,

20 135 Cal.App.4th 1463, 1479-83, 38 Cal.Rptr.3d 653 (2005)) shows why:  the National Bank Act

21 preempts the UCL insofar as it might otherwise impose limitations on national banks beyond

22 simply providing additional remedies for violation of OCC regulations.  The Ninth Circuit

23 recently confirmed that the UCL's "unfair" and "fraudulent" practice prongs may not be used to

24 impose limitations or requirements on national banks' advertising or other promotional activities

---

25 [1]      Section 45(a)(2) provides: "The Commission is hereby empowered and directed to prevent
26 persons, partnerships and corporations, ***except banks***, savings and loan institutions described in
   section 57a(f)(3) of this title … from using unfair methods of competition …." (Emphasis added.)

27 [2]      Section 6105(a), part of the Telemarketing and Consumer Fraud and Abuse Prevention Act
   (15 U.S.C. §6101, et seq.) provides: "… this chapter shall be enforced by the Commission under the
28 Federal Trade Commission Act (15 U.S.C. 41 et seq.).  Consequently, no activity which is outside the
   jurisdiction of that Act shall be affected by this Chapter."

<center>- 2 -</center>

1   in connection with loans not secured by real property. *Rose v. Chase Bank USA, N.A.*, 513 F.3d

2   1032, 1038 (9th Cir. 2008); *see* 12 C.F.R. §7.4008(d)(2)(viii), 7.4009(b).

3       Even if the UCL were not preempted, Keck's complaint fails to allege a claim under that

4   statute's "unfair" and "fraudulent" practice prongs because, as already mentioned, it merely

5   quotes what was said during the telemarketing call and then states a series of conclusions without

6   explaining why what was said or not said during the telemarketing call was false, misleading or

7   unfair.

8                                              **III.**

9       **KECK DOES NOT ALLEGE A VIOLATION OF PENAL CODE SECTION 632**

10      Trying to sustain his second cause of action, Keck initially erects and demolishes a

11  strawman. (Opp., 10.)  He argues vehemently that the California Supreme Court has twice held

12  recently that Penal Code section 632 protects against nonconsensual recording of telephone calls

13  "regardless of the content of the conversation."

14      BofA never claimed otherwise.  Instead, it argued that Keck's complaint does not allege

15  the conversation was "confidential" within section 632's meaning.  (Opening Memo., 8:27-28.)

16  Section 632 prohibits recordation only of "confidential" calls; that is, a telephone call that a party

17  to the conversation has an objectively reasonable expectation that is not being overheard or

18  recorded. *Flanagan v. Flanagan,* 27 Cal.4th 766, 772, 774, 41 P.3d 575 (2002).  Keck alleges no

19  facts to establish that he had a reasonable expectation that the telemarketer would not record the

20  call.  To the contrary, his complaint shows he consented to recordation of the call.

21      Keck is also wrong in arguing that his consent could not have been effective as to the

22  three questions and answers that were recorded before his consent was obtained.  (Opp., 10.)

23  Keck cites only one authority for his argument.  It deals with waiver, not consent, and so casts

24  little light on the subject.  No case has held that consent to recording cannot retroactively validate

25  the recording of a telephone call under section 632 or that post hoc consent cannot show that the

26  conversation was not "confidential" to begin with.  The statute's purpose is not served by the sort

27  of "gotcha" interpretation Keck proposes.

28

10597/0056/664896.1

IV.

## KECK HAS NOT ALLEGED A CLRA CLAIM

### A.    The CLRA Does Not Apply To This Transaction

As shown in BofA's opening memorandum (pp. 9-14), the CLRA does not apply to Keck's transaction for two reasons: it was a business, not a consumer, transaction, and it was a credit transaction, not the sale or rental of goods or services.

#### 1.    The CLRA Does Not Apply To A Business Card Service

In his opposition, Keck contends that though the "business card security" service was offered to him in connection with his business credit card, the service was nevertheless for consumer (i.e., "personal, family, or household) purposes because it protected his personal assets from liability based on his personal disability or unemployment. (Opp., 10-11.) Keck also points out that the service was sold to him as guarantor of the business card, not to the business itself, and the telemarketer called him personally at his home. (*Id.*)

Keck cites no authority for his unique interpretation of the CLRA, and nothing else supports or recommends it. Individuals may and do engage in business. When they do so, they commit their personal assets to business use or risk, except when shielded by the formation of a corporation, limited liability company or limited partnership. Using or risking personal assets in a business does not convert an otherwise purely commercial or business transaction into a consumer transaction.[3] Otherwise, every contract with a sole proprietor would be a consumer transaction.

Nor is the business card security service converted to a consumer use simply because a personal event—here, Keck's disability or unemployment—triggers the provision of benefits. The CLRA's coverage depends on whether the purchaser buys for personal, family or household purposes and on whether services are provided for other than a commercial or business use. (Cal. Civ. Code, §1761(b), (d).) Use and purpose determine the act's application, not the trigger of benefits. Thus, key man insurance issued to a business is not within the CLRA's scope even

---

[3]    *See Dinjian v. Dinjian,* 22 Mass.App.Ct. 589, 596, 495 N.E.2d 882, 887(1985) (loans made by two individuals from their personal assets to commercial builders were not transactions primarily for personal, family or household purposes).

- 4 -

though benefits are paid only on the key man's death or incapacity. *See* 2 Richard C. Bennett, et al., Business Insurance Law & Practice Guide, §12.04, pp. 12-16—12-20 (Mathew Bender 2007).

Least of all does it matter who the telemarketer called or where. As an individual may engage in business in his own name or by a fictitious business name. A service offered in connection with the business is no less for commercial or business purposes because it is offered to the businessman in his own name rather than his business moniker. The CLRA's coverage turns on use or purpose of the service, not the name of the offeree or the place at which he is called.

BofA's business card security service was offered to guarantors of business credit cards to cancel or suspend their obligation to repay debts incurred for business purposes. It is a service provided for a commercial or business use, not for personal, family or household purposes. Therefore, it falls outside the CLRA's scope.

Furthermore, Keck's contrary contention merely moves him from frying pan to fire. OCC regulations govern consumer debt cancellation or suspension services offered by national banks. See 12 C.F.R. part 37. The regulations specifically address advertising practices and required disclosures. 12 C.F.R. §§37.3(b), 37.6 & App. A, B. They further provide that "[n]ational banks' debt cancellation and debt suspension agreements *are governed* by this part and applicable Federal law and regulations, and *not* by part 14 of this chapter or *by State law*." 12 C.F.R. §37.1(c) (emphasis added). Thus, if the business card security service were, in fact, offered for personal, family or household purposes, the cited OCC regulation would preempt the CLRA in any event, still leaving Keck without a valid claim under that state statute.

## 2.    The CLRA Does Not Extend To Debt Cancellation Or Suspension

As shown in BofA's opening memorandum (pp. 9-13), the CLRA does not apply to credit transactions. *See Berry v. American Express Pub., Inc.,* 147 Cal.App.4th 224, 233, 54 Cal. Rptr.3d 91 (2007); *In re Late Fee & Over-Limit Fee Litig.*, 528 F.Supp.2d 953, 966 (N.D. Cal. 2007) (Armstrong, J.).

Keck's arguments fail to overcome or avoid this rule which kills his CLRA claim.

1    First, Keck observes that *Berry* and other cases following it have all involved "raw exten-

2    sions of credit." Implicitly, Keck seeks to distinguish the business card security service as in-

3    volving something other than "raw" credit. (Opp., 11-12.) This argument runs aground quickly,

4    however, as a debt cancellation or suspension agreement, such as the business card security ser-

5    vice, is nothing but an additional term of a credit transaction. *See* 12 C.F.R. §37.2(f), (g).[4]

6    Second, Keck appears to suggest that this Court should reject *Berry* and follow *Hernandez*

7    and *Jefferson*,[5] instead—following California law as it believes the California Supreme Court

8    would apply it. (Opp., 12-13.) For the reasons stated in BofA's opening memorandum (pp. 11-

9    13), *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) forecloses that argument.

10   This Court must follow *Berry*, an intermediate state appellate court decision absent "convincing

11   evidence that the state's supreme court likely would not follow it." *Id.* There is no such

12   evidence. *Kagan* and *Corbett* supply no such evidence, as they did not even address the issue.

13   (*See* opening memo., 12 n. 13.) The opinions of other federal judges (as in *Hernandez* and

14   *Jefferson*) are "not 'convincing evidence that the state supreme court would decide [an issue]

15   differently' ...." *Ryman*, 505 F.3d at 995 n. 1.

16   Third, Keck argues that *Berry* was wrongly decided. Even were he correct,[6] it is not this

17   Court's proper function to teach state courts how to better interpret their state's laws. As *Ryman*,

18   505 F.3d at 995, holds, this Court must follow *Berry*, even if it thinks it was incorrect, unless

19   there is convincing evidence that the California Supreme Court will come out the other way.

20

21   [4]    "Debt cancellation contract means a loan term or contractual arrangement modifying loan
      terms under which a bank agrees to cancel all or part of a customer's obligation to repay an extension
22   of credit from that bank upon the occurrence of a specified event." "Debt suspension agreement
      means a loan term or contractual arrangement modifying loan terms under which a bank agrees to
23   suspend all or part of a customer's obligation to repay an extension of credit from that bank upon the
      occurrence of a specified event." 12 C.F.R. §37.2(f), (g).

24   [5]    *Jefferson v. Chase Home Fin. LLC*, 2007 WL 1302984 at *3 (N.D. Cal. 2007) (Henderson, J.);
25   *Hernandez v. Hilltop Fin. Mortg., Inc.*, 2007 WL 3101250 at *5-6 (N.D. Cal. 2007) (Illston, J.).

26   [6]    Aside from disputing *Berry's* reading of the CLRA's legislative history—a point already
      covered in BofA's opening brief—Keck argues only that excepting credit transactions from the
      CLRA's scope would "negate" Civil Code section 1770(b), which forbids a mortgage broker or lender
27   from using a home improvement contractor to negotiate loan terms. (Opp., 13.) As is obvious from
      that subdivision's very different wording, it was a late addition to the CLRA, *see* Cal. Stats. 1996, ch.
28   684, with a separate purpose and scope from section 1770(a), on whose prohibitions Keck's claim
      depends. (See Request for Judicial Notice, Exs. A, B.)

- 6 -

1    Fourth, Keck temporizes, claiming the Court should not decide the issue on a motion to

2  dismiss or while *Fairbanks v. Superior Court*, no. S157001, remains pending in the California

3  Supreme Court. He is wrong. The issue of the CLRA's scope is a question of law, not fact.

4  Motions to dismiss appropriately raise such legal questions for decision. The pendency of

5  *Fairbanks* is also no reason for delaying decision. The issue in *Fairbanks* is whether the CLRA

6  covers insurance, not credit. A decision on that related issue may or may not cast light on the

7  different issue raised here, and in any event the California Supreme Court may not decide

8  *Fairbanks* for several years.

9    **B.    Keck Does Not Allege A CLRA Violation To Rule 9(b) Standards**

10    As stated in BofA's opening memorandum (pp. 15-16), Keck's complaint fails to meet

11  Rule 8(a), let alone Rule 9(b), standards in alleging facts upon which Keck seeks to base a CLRA

12  claim.

13    For the first time, in his opposition (pp. 13-15), Keck draws a connection—missing from

14  his complaint—between the raw facts alleged in paragraphs 13, 16 and 17 and the conclusions

15  averred in paragraph 44. The opposition is not the complaint, however. The bridge must be

16  alleged, not stated in a separate brief. *Morris*, 2007 WL 3342612 at *3.

17    Moreover, Keck's new connections are irrational leaps of faith, not reasonable inferences

18  from the alleged facts or reasonable interpretations of the CLRA's provisions. Keck begins by

19  saying he has averred that "

20    the telemarketer tricked him into signing up for a debt protection
     service he did not want or need by indicating that he would be sent
21    materials out "to review" without charge and hiding the financial
     ramifications of his acquiescence.
22

23  (Opp., 13-14.)

24    Even were this an accurate summary of the telemarketing call recited in paragraph 13,[7] it

25  provides absolutely no support for Keck's assertion that BofA thereby violated Civil Code section

26

27  ───────────────
     [7]    In fact, the telemarketer stated the "financial ramifications of his acquiescence": "you
28  understand this (sic) on a monthly fee of eighty five cents for one hundred dollars a month, your
     outstanding bill (sic) will be billed to your Bank of America business card account ...." (1st
     Amended Compl., 4:6-9.)

- 7 -

1   1770(a)(13) (misstating reasons for or amounts of price reductions) or 1770(a)(14) (representing

2   that a transaction confers or involves rights, remedies or obligations that it does not). Nowhere

3   does the complaint—even as Keck has misinterpreted in the above-quoted portion of his

4   opposition—say anything about any price reduction.[8] Nor does it allege any affirmative

5   representation regarding rights, remedies or obligations that the business card security service

6   supposedly lacks. At best, Keck avers the telemarketer "hid" some right, remedy or obligation

7   that the transaction actually had—but section 1770(a)(14), even liberally construed, does not

8   forbid that conduct. *See Daugherty v. American Honda Motor Co.*, 144 Cal.App.4th 824, 834-36,

9   51 Cal.Rptr.3d 118 (2006); *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1276,

10  39 Cal.Rptr.3d 634 (2006).

11          Next, Keck says he has alleged he was given a run-around when he complained about the

12  charges to his account. BofA told him to contact the vendor. CSI told him the charges were

13  BofA fees. He received a letter on BofA letterhead signed by CSI. (1st Amended Compl., ¶¶16,

14  17.) These facts, he claims, show a violation of section 1770(a)(2), (3) and (5) which ban

15  misrepresenting the source of services, or affiliation or sponsorship of another. (Opp., 14.) Keck

16  is wrong. He has not alleged he was told the business card security service was provided by

17  anyone other than BofA. Nor has he alleged that CSI is, in fact, not affiliated with the service.

18  Instead, he claims the exact nature of CSI's affiliation was not explained to him. But section

19  1770(a)(2), (3), and (5) do not require such an explanation. They are aimed at entirely different

20  conduct—affirmative misrepresentations of source or affiliation.[9]

21          Finally, Keck says he has alleged he would not gain any benefit from the business card

22  security service since he was unemployed and on Social Security. (Opp., 14.) This, he says

23  _____

24  [8]     Sending materials out without charge is not a price reduction, as the materials explaining
        the business card security service are not themselves the service for which Keck would be
25  charged. Moreover, Keck does not allege that he was not sent materials or that he was charged
        for the materials he was sent. He also does not claim he was not given the 30-day free trial period
26  that the telemarketer mentioned.

27  [9]     The accompanying legislative report on the bill which became the CLRA indicates that
        section 1770(a)(2), (3) and (5), originally 1770(b), (c) and (e), were intended to reach
28  misrepresentations such as claiming goods were "super" or "supreme" in the absence of industry-
        accepted standards, or representing that a product has the approval of or is used by a famous
        person, when that is not true. (*See* RJN, Ex. C.)

- 8 -

1    shows a violation of section 1770(a)(7) (representing that services are of a particular standard if

2    they are of another) and section 1770(a)(14) (representing that a transaction confers rights it does

3    not have). Nonsense. Keck does not claim the telemarketer told him anything that was not true

4    or that the materials he was sent misrepresented the nature of the business card security service or

5    its benefits. Instead, Keck claims he is an Eskimo who will get little benefit from the refrigerator

6    he was sold. The CLRA prohibits misrepresentations, not sales of services to those who do not

7    need or may not benefit from them.

8        Keck also claims that by selling him the business card security service from which he

9    claims he could not benefit, BofA violated section 1770(a)(18) which bans "inserting an

10   unconscionable provision in the contract." This, too, is wrong. Keck does not claim that any

11   term of the contract was unconscionable. Indeed, neither his complaint nor his opposition brief

12   even mentions any term of the contract. Instead, Keck's complaint is that a perfectly

13   conscionable service and contract was sold to an inappropriate person—an unemployed

14   individual on Social Security. Section 1770(a)(18) does not reach that conduct. Furthermore, if it

15   did, it would be preempted by the National Bank Act. *Rose*, 513 F.3d at 1038; *Late Fee & Over-*

16   *Limit Fee Litig.*, 528 F.Supp.2d at 966; 12 C.F.R. §§7.4008(d)(2)(iv), (viii), 7.4009(b).

17                                     **V.**

18           **ELDER ABUSE IS NOT A SEPARATE CAUSE OF ACTION**

19        Keck cannot state a claim for elder abuse because the Elder Abuse Act and Welfare and

20   Institutions Code section 15610.30 in particular create no new or independent private right of

21   action. *Berkley v. Dowds*, 152 Cal.App.4th 518, 529, 61 Cal.Rptr.3d 304 (2007) so holds: "The

22   Act does not create a cause of action as such, but provides for attorney fees, costs, and punitive

23   damages under certain conditions."

24        Keck tries to avoid this clear, unmistakable pronouncement by labeling it dicta, not

25   holding. (Opp., 16.) He is wrong. *Berkley* affirmed the sustaining of a demurrer to the elder

26   abuse cause of action. Its first reason for doing so is the one just quoted. Its second reason for

27   reaching the same result was the plaintiff's failure to allege sufficient facts. Both alternative

28

1   grounds for the decision are holding, not dictum. *Southern Cal. Ch. of Associated Builders etc.*

2   *Com. v. California Apprenticeship Council*, 4 Cal.4th 422, 431 n. 3, 841 P.2d 1011 (1992).

3           By contrast, the only California state appellate decision that Keck cites for the contrary

4   proposition never addressed the point.[10]  (Opp., 15.)  Keck does cite two federal district court

5   decisions that, without extensive analysis, allow elder abuse claims to proceed.[11]  However, under

6   *Ryman*, 505 F.3d at 995 & n. 1, this Court must follow *Berkley*, an intermediate state appellate

7   court decision, not conflicting opinions of other federal judges when interpreting state law.

8           Furthermore, even if there were an independent claim for elder abuse, Keck has not

9   alleged facts sufficient to establish such a claim.  Since elder abuse requires fraudulent intent (1st

10  Amended Compl., ¶52; Welf. & Inst. Code, §15610.30), an elder abuse claim, if it existed, would

11  have to meet Rule 9(b) standards, and Keck's pleading fails even to satisfy Rule 8(a)

12  requirements.  Keck's complaint does not provide the required factual connection or explanation

13  between the telemarketing call, mishandling of his later complaint (*see* 1st Amended Compl.,

14  ¶¶13, 16, 17) or other allegedly wrongful conduct and the statutory elements of elder abuse.  As

15  with his other claims, Keck leaves it unclear what conduct he bases his claim on and why he

16  contends that conduct violates the statute under which he purports to sue.

17                                          **VI.**

18                **KECK ALLEGES NO CLAIM FOR UNJUST ENRICHMENT**

19          Keck's otherwise deficient complaint does not allege an unjust enrichment claim

20  sufficient to withstand a motion to dismiss.  As Judge Alsup ruled in *Falk v. General Motors*

21

22

---

23  [10]    In *Intrieri v. Superior Court*, 117 Cal.App.4th 72, 82-85, 12 Cal.Rptr.3d 97 (2004), the
    defendant did not argue that there was no independent cause of action for elder abuse.  Instead, it
24  moved for summary judgment on the ground there was no evidence to reckless neglect.  The
    Court of Appeal disagreed, finding a triable issue of fact existed as to reckless neglect.  Similarly,
25  in *Negrete v. Fidelity & Guar. Life Ins. Co.*, 444 F.Supp.2d 998, 1001-03 (C.D. Cal. 2006), the
    defendant did not argue there was no cause of action for elder abuse, but instead that plaintiffs
26  had not alleged facts showing it had "taken," "secreted," "appropriated," or "retained" the elder's
    funds.
27
    [11]    See Opp., 15-16, citing *Wolk v. Green*, 516 F.Supp.2d 1121, 1136-27 (N.D. Cal. 2007)
28  (Zimmerman, M.J.); *Genton v. Vestin Realty Mortg. II, Inc.*, 2007 WL 951838 at *2 (S.D. Cal.
    2007).

                                          - 10 -

*Corp.*, 496 F.Supp.2d 1088, 1099 (N.D. Cal. 2007), the "sole remedies available for the violations alleged have been discussed above, so there will be no occasion for resort to unjust enrichment."[12]

Keck's arguments to the contrary notwithstanding, he cannot truthfully allege that BofA unjustly retains his money. In December 2007, BofA refunded to him the $334.58 it had charged him for the business card security service. Keck does not and cannot allege otherwise. He has no viable, stand-alone claim for unjust enrichment and has not alleged one in his complaint.

## VII.

## CONCLUSION

For the reasons stated above and for those stated in BofA's opening memorandum, the Court should grant the motion to dismiss.

DATED:  April 4, 2008

<div align="right">

SEVERSON & WERSON
A Professional Corporation

/s/ *Jan T. Chilton*

By: _____
          Jan T. Chilton

Attorneys for Defendant
Bank of America, N.A.

</div>

---

[12]    *See also Late Fee & Over-Limit Fee Litig.*, 528 F.Supp.2d at 967 ("[T]he plaintiffs' claim of 'unjust enrichment,' does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefited from actions that are unlawful under other theories of liability in their complaint. … Accordingly, this claim must necessarily be dismissed when the other claims are dismissed."); *Berryman v. Merit Property Management, Inc.*, 152 Cal.App.4th 1544, 1557, 62 Cal.Rptr.3d 177 (2007) (dismissing tag-along unjust enrichment claim lacking factual allegations and dependent on insufficient UCL claim).



1  MARK JOSEPH KENNEY (State Bar No. 87345)
   mjk@severson.com
2  JAN T. CHILTON (State Bar No. 47582)
   jtc@severson.com
3  JOSHUA E. WHITEHAIR (State Bar No. 244900)
   jew@severson.com
4  SEVERSON & WERSON
   A Professional Corporation
5  One Embarcadero Center, Suite 2600
   San Francisco, CA  94111
6  Telephone:  (415) 398-3344
   Facsimile:  (415) 956-0439
7

8  Attorneys for Defendant
   Bank of America, N.A.

9            UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11

12  DAVID KECK, an individual,              Case No.:  CV 08-1219 CRB

13              Plaintiff,                  **REQUEST FOR JUDICIAL NOTICE IN
                                            SUPPORT OF BANK OF AMERICA'S**
14       vs.                               **MOTION TO DISMISS FIRST
                                            AMENDED COMPLAINT**
15  BANK OF AMERICA, a Delaware
    Corporation; CENTRAL STATES            Hearing Date:   April 18, 2008
16  INDEMNITY CO. OF OMAHA, a Nebraska     Time:           10:00 a.m.
    Corporation; CSI PROCESSING, LLC, a    Courtroom:      8
17  Nebraska Company, and DOES 1 through 100, Judge:        Hon. Charles R. Breyer

18              Defendants.                 Complaint Date:  December 17, 2007

19  _____    Trial Date:  Not Set

20                                          Accompanying Document:  Reply
                                            Memorandum of Points and Authorities
21

22       In support of their motion to dismiss untimely claims or strike limitations-tolling

23  allegations, defendant Bank of America, N.A. respectfully requests that this Court take judicial

24  notice of the following legislative history documents pursuant to Fed. R. Evid. 201(b)(2), (d):

25       1.    The Report of the California Senate Judiciary Committee on Senate Bill No. 2045

26  (1995-96 Reg. Sess.), as amended on April 18, 1996.  A true copy of the report is attached as

27  Exhibit A.  The report is publicly available from the official website of the Legislative Counsel of

28

California at <http://www.leginfo.ca.gov/pub/95-96/bill/sen/sb_2001-2050/sb_2045_cfa_960418 _114640_sen_comm.htmlb>.

2.    The California Senate's Third Reading Report on Senate Bill No. 2045 (1995-96 Reg. Sess.), as amended on July 10, 1996.  A true copy of the report is attached as Exhibit B.  The report is publicly available from the official website of the Legislative Counsel of California at <http://www.leginfo.ca.gov/pub/95-96/bill/sen/sb_2001-2050/sb_2045_cfa_960801_124515_ asm_floor.html>.

3.    The Report Relative to California Assembly Bill No. 292 (1970-71 Reg. Sess.), printed in the Assembly Journal on September 23, 1970 at pages 8465-66.  A true copy of the report is attached as Exhibit C.

DATED:  April 4, 2008                              SEVERSON & WERSON
                                                   A Professional Corporation

                                                       /s/ *Jan T. Chilton*

                                                   By:_____
                                                        Jan T. Chilton

                                                   Attorneys for Defendant
                                                   Bank of America, N.A.

- 2 -

BILL ANALYSIS

SENATE JUDICIARY COMMITTEE
Charles M. Calderon, Chairman
1995-96 Regular Session

S
B

2
0
4
5

SB 2045
Senator Rosenthal
As amended on April 18, 1996
Hearing Date: April 23, 1996
Civil Code
GWW/md

HOME IMPROVEMENT LOANS

HISTORY

Source:  Consumers Union

Related Pending Legislation:  SB 1882 (Rosenthal)

KEY ISSUES

1. SHOULD IT BE AN UNFAIR OR DECEPTIVE PRACTICE, PUNISHABLE
   BY CIVIL DAMAGES, FOR A MORTGAGE BROKER OR LENDER, TO
   DIRECTLY OR INDIRECTLY USE A HOME IMPROVEMENT CONTRACTOR
   AS AN AGENT FOR ITS BUSINESS IN ANY MANNER, INCLUDING,
   BUT NOT LIMITED TO, NEGOTIATING THE TERMS OF A HOME
   IMPROVEMENT CONTRACT MORTGAGE LOAN OR ASSISTING IN
   FILLING OUT MORTGAGE LOAN APPLICATIONS?

2. SHOULD, AS REQUESTED BY THE OPPOSITION, AN EXEMPTION BE
   MADE TO: A) ALLOW HOME IMPROVEMENT CONTRACTORS TO
   RECOMMEND A LENDER TO A CONSUMER, AND B) ALLOW A LENDER
   TO PURCHASE COMPLETED HOME IMPROVEMENT CONTRACTS FROM A
   CONTRACTOR?

PURPOSE

Existing law prohibits enumerated unfair methods of
competition and
unfair or deceptive trade acts or practices.  A violator is



EXHIBIT
_A_

SB 2045 (Rosenthal)
Page 2


subject to liability for actual damages of not less than
$1,000, restitution, punitive damages, and any other relief
deemed proper by the court.

Civil Code Section 1770, as amended by SB 320 (Petris) of
1995, makes it a deceptive or unfair act for a person or
business to make a home solicitation of a senior citizen
(over age 65) for a loan encumbering the person's primary
residence for the purpose of paying for home improvements
where that transaction is part of a pattern or practice in
violation of specified provisions of federal law requiring
disclosure of repayment provisions and prohibiting
exorbitant loan fees and high interest rates.

This bill would provide that it is an unfair or deceptive
act or practice for a mortgage broker or lender, including,
but not limited to, consumer finance lenders or real estate
brokers licensed under California law, to, directly or
indirectly, use a home improvement contractor as an agent
for its business in any manner, including, but not limited
to, negotiating the terms of a home improvement contract
mortgage loan or assisting in filling out mortgage loan
applications.  These provisions would apply "regardless of
the receipt or the expectation of receipt of compensation
from a home improvement contractor."

COMMENT

1. Should a mortgage broker or lender be prohibited from
   using a home improvement contractor as an agent for its
   business in any manner, including, but not limited to,
   negotiating the terms of a home improvement contract
   mortgage loan, or assisting in filling out mortgage loan
   applications?

   Sponsored by Consumers Union ("CU"), SB 2045 is intended
   to provide a safeguard for a growing number of
   homeowners, mostly lower-income elderly and minority,
   targeted by unscrupulous contractors and loan brokers who
   convince the homeowner to purchase needed home
   improvement repairs or services by taking a risky and
   expensive loan on their home.

   In their report issued last Fall, "Dirty Deeds: Abuses
   and Fraudulent Practices in California's Home Equity
   Market", CU found that lender and brokers were frequently

SB 2045 (Rosenthal)
Page 3

using home improvement contractors as agents to negotiate
home improvement contract financing terms for home
improvement work that was not solicited by the homeowner.
Many of the negotiated loans were high interest rate,
high fee loans or have balloon payment clauses which
create the substantial likelihood that the homeowner will
default and thus lose his or her home.

Many lower income homeowners have assertedly lost their
homes in this manner.  According to estimates from the
Los Angeles District Attorney's major fraud division,
victims of home equity fraud in Los Angeles County lost
an estimated $183 million during 1993 and 1994. (Staff
has not reviewed or verified the methodology for arriving
at that figure.)  The Oakland and San Francisco areas
were also reported as being particularly affected.
(Another bill sponsored by Consumer Union, SB 1882
(Rosenthal), also scheduled for hearing today, seeks to
directly address the problem of "high interest, high fee"
loans by requiring a specific disclosure as to the nature
of that loan and provides for a greater "cooling off"
period.)

According to the report, one of the greatest sources of
home equity abuse has been home improvement projects in
which the contractor arranges for a loan to pay for the
work. Several examples are cited in the report:

- Eva D, a 55 year old widow, entered into a home
improvement loan after being approached by a contractor
and loan officer who offered to repair damage to her
property caused by the Loma Prieta earthquake.  She could
not read nor sign the loan documents because she had
glaucoma and had broken her glasses.  She instead signed
a blank piece of paper.  Her income at the time was less
than $1200 per month, but the lender arranged for a
$150,000 loan and charged $23,000 (over 15 points) in
loan fees.  The loan consolidated her existing mortgage
debt of $58,000 and provided $70,000 for home repairs.
The loan more than tripled her monthly loan payments from
$619 to just under $2,000 per month, which was almost
$800 more than her monthly income.  The promised repairs
to her home were never completed by the contractor who
was later discovered to be unlicensed.  She subsequently
defaulted on her monthly payments and her property was
foreclosed upon.   Her case against the lender is still

SB 2045 (Rosenthal)
Page 4


pending in the courts.

- Doris, a 78 year old woman, was tricked by a home
improvement salesperson into signing a contract for a new
fuse box and electrical wiring she did not need.  The
salesperson also convinced her to roll over her existing
loan into a new larger loan, resulting in a lien for
$33,895.20 on her home even though the value of the
improvement was just $1500.  Doris sued to invalidate the
contract and eventually settled the case with the lender.


-  Nora B, an 80 year old widow, had a first mortgage
payment on her home of just $214.00 per month.  She was
approached by a home improvement contractor who told her
that he could arrange for a loan to pay for new siding
for the house and to consolidate $15,000 of outstanding
consumer debt.  She was then visited by a representative
from the finance company who had her sign the loan
application and several other documents, some of which
had blank spaces.  The lender's representative asked Nora
if she could afford to pay $300 per month, but did not
explain the $32,900 balloon payment at the end of the 5
year loan.  Foreclosure proceedings were commenced when
Nora fell behind on her monthly payments.  She has filed
bankruptcy and obtained a temporary injunction.  The case
was still pending when the CU report was released in
October, 1995.

- Ms. Jones, a 73-year old homeowner who does not have
full control of her mental faculties because of several
strokes, needed repairs on her leaking roof.  A
representative of a home improvement contracting company
came to Ms. Jones' home and offered to have his company
do the repairs.  The representative told Ms. Jones that
he needed to inspect the premises in order to prepare an
estimate, and that he needed her written authorization to
make that inspection.  What Ms. Jones actually signed was
a home improvement contract and a $15,000 10 year loan at
19.5% liening Ms. Jones' property.  Ms. Jones sued to
rescind the transactions and eventually settled.

CU argues that by arranging for financing and acting as
the link between the customer and a lender, the
contractor is actually acting as a mortgage broker or, at
the very least, an undisclosed agent.

SB 2045 (Rosenthal)
Page 5

SB 2045 would make it an unfair or deceptive act for
mortgage brokers or lenders, including but not limited to
consumer finance lenders or real estate brokers licensed
under California law, to, directly or indirectly, use
unlicensed individuals as an agent to "broker" home
improvements loans, a practice for which a license is
currently required.  Under this bill, a home improvement
contractor could continue to introduce the customer to
the lender so that the customer and lender could make
their own contract without any aid or influence from the
contractor.  (A clarifying amendment may be appropriate
and necessary on this point.  See Comment 2a, below.)
What is prohibited by SB 2045 is conduct by the
contractor which makes the contractor an agent of the
lender or mortgage broker, e.g., negotiating the terms of
the loan or assisting in filling out the loan
application.  In that instance, CU argues, the contractor
serving as an agent to the lender without disclosing that
relationship to the homeowner makes the act unfair and
deceptive.

   a)    Practice of brokering a loan without a license is
         already illegal

      According to CU, current law already prohibits the
      brokering of a real estate loan by anyone other than a
      real estate licensee or a licensed finance lender or
      broker.  Business and Professions Code Section
      10131(d) provides that a person is subject to real
      estate broker licensing requirements when the person
      "solicits borrowers or lenders for or negotiates loans
      ... for borrowers or lenders or note holders in
      connection with loans secured directly or collaterally
      by liens on real property."  The Consumer Finance
      Lenders Law provides that "no person shall engage in
      the business of a finance lender or broker without
      obtaining a license...."  Financial Code Section 22004
      defines "broker" as "any person who is engaged in the
      business of negotiating or performing any act as a
      broker in connection with loans made by a finance
      lender."

      Thus, CU contends, a home improvement contractor who
      is not a licensed real estate broker or consumer
      finance lender, is breaking the law when he or she is

SB 2045 (Rosenthal)
Page 6

involved in any activity beyond merely introducing the
homeowner to the lender or broker.  In addition, the
licensed real estate broker or consumer finance lender
who is using the unlicensed person or compensating him
or her, directly or indirectly, is also breaking the
law.  (See Preach v. Monter Rainbow (1993) 12
Cal.App.4th 1441 and Business and Professions Code
Section 10137.)  SB 2045 essentially adds already
illegal practices to the list of statutory unfair and
deceptive practices, with the effect of increasing the
potential consumer remedies for such a violation.

b)     Provision of express civil remedy for violation

Under current law, a violation of the real estate
licensing laws is punishable by an administrative fine
and possible criminal prosecution.  (B & P Code
Sections 10137, 10138 and 10139.)  A violation of
Consumer Finance Lenders Law, including unlicensed
activity, is subject to an administrative civil
penalty of $2500 as determined in a civil action
brought by the Commissioner of Corporations.  As a
practical matter, agency resources limit the number of
prosecutions.  Conceivably, a person could bring a
civil damages action against the unlicensed "broker"
for fraud or deceit.  SB 2045 would provide an express
civil remedy in the law for such violations.

Opponents, the finance lending community, contend
that SB 2045 would place unnecessary restrictions upon
reputable lenders and contractors by removing their
ability to conduct business "as is common in the
marketplace today."  Beneficial Management
Corporations assert that after the consumer and
contractor has agreed upon a home improvement project,
the contractor frequently will help the consumer fill
out a credit application and submit it to a lender for
approval.  (Car dealers provide a similar service.)
Under SB 2045, the consumer would be forced to take
the extra step of finding a lender and completing the
mortgage application as a separate part of the
transaction.  Removing this option, opponents contend,
would create a tremendous inconvenience for the
parties.

Proponents respond that requiring the homeowner to

SB 2045 (Rosenthal)
Page 7

take the separate step to find a lender is not an
inconvenience but a safeguard against abuses by an
unscrupulous contractor.  Bet Tzedek Legal Services,
in support of the bill, writes:

>"On the surface, it may seem that there is
>nothing wrong with a contractor and broker
>working together.  The problem is that
>contractors are in essence acting as brokers of
>loans.  They are not shopping for the best loan
>for their clients.  In many cases, the homeowner
>is never aware that the contractor signed her up
>for a loan.  In other cases, the contractor is
>directly paid by the lender....We believe it is
>essential to enact SB 2045 to give homeowners
>adequate protection from lenders who use
>contractors to steer unwary borrowers into
>hard-money loans."

2. Should, as requested by the opposition, an exemption be
made to: a) allow home improvement contractors to
recommend a lender to a consumer, and b) allow a lender
to purchase completed home improvement contracts from a
contractor?

As originally drafted, the bill would not have prohibited
home improvement contractors from referring consumers to
mortgage brokers or lender, or lenders from purchasing
executed home improvement contracts.  The exemption was
removed by CU after concerns were raised by some
supporters that the exemptions could have swallowed the
rule.

The supporters feared that unscrupulous contractors would
continue to steer their customers to certain
"cooperative" lenders who would pay a referral fee or
commission, adding to the customer's costs.  They also
feared that allowing lenders to continue purchasing
executed home improvement loans would indirectly allow
current abusive practices to continue -- instead of the
contractor signing the customer to the lender's loan, he
would instead sign the customer to his own loan and then
sell the loan to the lender.

Opponents contend that the exemptions should be restored
because the general prohibition of SB 2045 would call

SB 2045 (Rosenthal)
Page 8

these everyday occurrences into question.  Household
International writes:

> "The bill would not allow home improvement
> contractors to act "directly or indirectly" as an
> agent of a lender, but it does not detail the
> actual issues it is attempting to address.
> Indirectly acting as an agent is a very low
> threshold that may be met by simply referring
> customers to lenders or by lenders purchasing
> home improvement contracts on a regular basis."

WOULD USE OF THE LANGUAGE, DIRECTLY OR INDIRECTLY, GIVE
FAIR NOTICE TO LENDERS AND CONTRACTORS OF THE TYPE OF
CONDUCT THAT WOULD SUBJECT THEM TO CIVIL DAMAGES?

a)    Should an exemption be made for simple referrals to
a lender?

An exemption for a simple referral by the
contractor to a lender or mortgage broker, without
more, would not appear to fall within the forms of
abusive practices the bill is intended to prevent.
However, a referral for consideration (e.g.,
kickback), or a referral which is tied to the contract
(e.g., contract valid only if lender X is used) raises
significant potential for abuse.

SHOULD THE BILL BE AMENDED TO EXEMPT SIMPLE
REFERRALS?

b.    Should an exemption be made to allow lenders to
purchase completed home improvement contracts?

Opponents contend that lenders regularly purchase
completed home improvement contracts from
contractors.  For lenders, it is a regular source of
business which should not be barred.

This proposed exemption raises far more serious
problems than the requested exemption for simple
referrals.  Under this provision, an unscrupulous
contractor could continue to write unconscionable
home improvement financing contracts and sell them to

SB 2045 (Rosenthal)
Page 9

a cooperating lender.  Proponents of the bill contend
that this proposed exemption would "gut the bill" and
protect a major form of fraud being practiced upon
unsuspecting homeowners.

A similar issue was raised in SB 320 (Petris), which
makes it a deceptive or unfair act for a person or
business to make a home solicitation of a senior
citizen for a loan encumbering the person's primary
residence for the purpose of paying for home
improvements where that transaction is part of a
pattern or practice in violation of specified
provisions of specified federal laws.  To address
lender concerns the bill was amended to provide that
a third party is not liable unless (1) there was an
agency relationship between the party who engaged in
home solicitation and the third party or (2) the
third party had actual knowledge of, or participated
in, the unfair or deceptive transaction.  It also
provided that a third party who is a holder in due
course under a home solicitation contract is not
liable.

SHOULD THIS STANDARD OF SB 320 BE ADOPTED IN THIS
BILL?

Support:Western Center on Law and Poverty; Public Council
        (Public  Interest Law of the Los Angeles and
        Beverly Hills Bar Association); Bet Tzedek Legal
        Services; Legal Aid Foundation of Los Angeles;
        Legal Assistance for Seniors

Opposition:  Beneficial Management Corporation; Household
        International; American General Finance, Inc.;
        California Association of Mortgage Brokers;

Prior Legislation:  None Known

                    * * * * * * * * * * * * * *

SB 2045
Page 1

SENATE THIRD READING
SB 2045 (Rosenthal)
As Amended July 10, 1996
Majority vote
  SENATE VOTE:  22-8

  CONSUMER PROTECTION  8-0

 SUMMARY:  Provides that it is an unfair or deceptive act or
practice for a mortgage broker or lender, as defined, to use a
home improvement contractor to negotiate the terms of a mortgage
loan to finance a home improvement contract.
Specifically,  this bill:

1) Provides that it is an unfair or deceptive act or practice for
   a mortgage broker or lender to directly or indirectly use a
   home improvement contractor to negotiate the terms of any loan
   that is secured, whether in whole or in part, by the residence
   of the borrower and which is used to finance a home improvement
   contract.

2) Defines the phrase "mortgage broker or lender" to include a
   finance lender licensed pursuant to the California Finance
   Lenders Law, a residential mortgage lender licensed pursuant to
   the California Residential Mortgage Lending Act, or a real
   estate broker licensed under the Real Estate Law.

3) Specifies that:  a) the above provisions are not to be
   construed to either authorize or prohibit a home improvement
   contractor from referring a consumer to a mortgage broker or
   lender; b) a home improvement contractor may refer a consumer
   to a mortgage lender or broker if the referral does not violate
   existing law; c) a mortgage broker or lender may purchase an
   executed home improvement contract if that purchase does not
   violate existing law; and d) the above provisions shall have no
   effect on the application of the Unruh Act as it relates to a
   home improvment transaction or the financing thereof.

  FISCAL EFFECT:  None

  EXISTING LAW:

1) Prohibits enumerated unfair methods of competition and unfair
   or deceptive trade acts or practices, as specified.

2) Provides that any consumer who suffers damages as a result of
   the use or employment by any person of any unlawful method, act
   or practice, as specified, may bring an action against such
   person to recover any of the following: a) actual damages; b)
   an order enjoining the illegal methods, acts, or practices; c)
   restitution of property; d) punitive damages; or e) any other
   relief the court deems proper.  Provides that if the consumer
   who suffers such damages is a senior citizen or a disabled
   person, as defined, may recover additional damages of up to
   $5,000.



SB 2045
Page 2

3) Prohibits any person, in connection with an inducement to enter
   into a home improvement contract which may be performed by a
   contractor, from promising or offering to pay, credit or allow
   to any owner, compensation or reward for the procurement or
   placing of home improvement business with
others.

 BACKGROUND:  According to Consumers Union, the sponsor of this
bill, there are a number of abuses currently being perpetrated on
California homeowners.  One of the largest abuses involves the
solicitation of home equity loans and home improvements contracts.

Frequently, high cost home equity loans are sold to homeowners in
order to finance home improvement work that was neither solicited
or needed by the homeowner.  High pressure home improvement
salespeople and unscrupulous lenders have been successful in
manipulating and deceiving homeowners who have substantial equity
in their homes into signing for loans with interest rates as high
as 30% and fees of 20 or more points.  Regard is not always paid
to whether or not the homeowner has the ability to repay the loan.
 Often times, the end result of this is that the homeowner, who is
quite often elderly or low income, ends up defaulting on the loan
and ultimately loses the home through foreclosure.

This legislation is designed to curb these abuses by prohibiting a
mortgage broker or lender from using a home improvement contractor
to negotiate the terms of a loan for home improvements.

Related legislation:  Last year, SB 320 (Petris), Chapter 255,
Statutes of 1995, amended the statutory scheme governing unfair
business practices.
SB 320 prohibits the home solicitation of a consumer who is a
senior citizen where a loan is made encumbering the primary
residence of that consumer for the purposes of paying for home
improvements and where the transaction is part of a pattern or
practice in violation of either subsection (h) or (i) of Section
1639 of Title 15 of the United States Code or subsection (e) of
Section 226.32 of Title 12 of the Code of Federal Regulations.

 ARGUMENTS IN SUPPORT:  The sponsor argues that this bill will
provide a safeguard for a growing number of homeowners, mostly
lower income seniors, targeted by unscrupulous contractors and
loan brokers who convince the homeowner to purchase home
improvement repairs or services by taking a risky and expensive
loan on their home.  This bill reinforces public protections for
homeowners and does this without abridging the rights of
legitimate lenders, brokers and contractors.

 ARGUMENTS IN OPPOSITION:  None


Analysis prepared by:  John V. De Rosa / aconpro / (916) 324-7440

FN

SB 2045
Page 3

026664

Report Relative to Assembly Bill No. 292

Assembly Committee on Judiciary
September 23, 1970

*The Honorable Bob Monagan*
*Speaker of the Assembly*
Re: Assembly Bill 292

Dear Mr. Speaker: Attached is a report on the above bill prepared by the undersigned in order to indicate more fully the intent of the Legislature with respect to this measure.

Respectfully submitted,

JAMES A. HAYES, Chairman
Assembly Judiciary Committee

———

The Consumers Legal Remedies Act is designed to provide affirmative remedies for consumers which will protect them from unscrupulous business practices while insulating responsible businessmen from spurious or vexatious lawsuits. This is done by providing the consumer a lawsuit for himself or on behalf of all other similarly situated consumers to rescind unfair business transactions, collect damages, and stop future bad practices.

Section 1770 of the Civil Code provides sixteen specific practices outlawed by the Act. By way of illustration and not limitation the following are examples of violations of each subdivision of Section 1770:

a. Selling a product *as being made by Y* when it is *really made by X*. Although passing off originally denominated unauthorized use of trade identification, today the term is also applied to covert substitution of a different brand of goods for the one requested by a customer. *Coca-Cola Co. v. Foods, Inc.*, 220 F. Supp 101.

b. There exists today no industry-wide, government or other accepted system of quality standards or grading of industry products. Within the industry, however, a variety of trade terminology has developed which, when used in conjunction with consumer transactions, has the tendency to suggest that a system of quality standards or grading does in fact exist. Typical of such terminology are the expressions "premium" "super" "supreme". The consumer, usually does not understand the significance of the absence of accepted or quality standards and is likely to assume that these expressions connote valid criteria. Since a consumer may misinterpret the meaning of such terminology, he may be deceived into buying a more inferior product because it has been given such designation.

This confusion as to commercial source, approval, endorsement, or certification of goods or services caused by trademarks, or collective marks likely to be associated with pre-existing trade symbols.

c. Representing that a product, such as tires, has the approval of Parnelli Jones, or that someone like Mario Andretti always uses brand X tire when he doesn't.

In *Vissir v. Macres*, Cal App 2 249 defendant opened up a competing florist shop with the same name as plaintiff's at plaintiff's former location after the latter had moved across the street.

d. Selling a camera as being made in Japan when it is really made in Taiwan. Or perfume concentrate imported from France and combined in the U.S. with domestic alcohol may not be sold as imported perfume. *Distributors, Inc. v. FTC*, 263 Fed 396.

e. This section would be violated by actually representing that there is an industry wide system of grading tires when there isn't, and actually representing that the tire being sold meets those standards. Actually representing that the tires are used or approved by Parnelli Jones or Mario Andretti would also be violations.

f. It would be a deceptive practice for a salesman to fail to disclose that products are reprocessed even though the reprocessed products are as good as new. *FTC v. Colgate Palmolive* 85 S. Ct. 1035.

g. A violation of this section would be an advertisement representing that bread sold under trademark "Lite Diet" was a low calorie food when in fact it contained same number of calories as other white bread but had thinner slices.

1

(800) 666-1917

LEGISLATIVE INTENT SERVICE



h. False assertions as to a product's inferiority.

i. Advertising to sell a quality Y tire when you actually intend to sell a quality X tire, one of lesser quality.

j. To lure consumers into a store, an advertisement will offer a product at a very low price, but the seller will intend to only sell one or two of the offered product. An appliance store will offer to sell a T.V. at $100 less than its regular retail price, but will only offer one or two T.V. sets.

k. This subsection applies to spurious "fire" and "liquidation" sales as well as to fictitious price cuts.

i.e., "Prices are slashed due to impending bankruptcy."

l. In this case the subsection would be violated if the seller advertised "satisfaction or your money back" or "10-day free trial", as they are usually construed as a guaranty that the full purchase price will be refunded. Any conditions to the contrary should be set forth.

m. Self-explanatory.

Protect the innocent consumer from the unscrupulous practices of repairmen. Recommending that new brakes are needed, or that a new battery is needed when they are not.

n. A seller would be in violation of this subsection by selling a different product than the one advertised. The seller sells the regulation model rather than the luxury model advertised.

o. The consumer, in this instance, might be required to buy an additional product before he could receive the advertised discount, or that he buy a more expensive and high quality product than the one advertised.

p. The prime example of a violation of this subsection is the car salesman who negotiates a deal, but before the contract can be signed, he tells the consumer that he has to get approval. Of course, when he returns, he tells the consumer that 'his boss' won't let him sell the car at such a low price, so new adjustments must be made.

Since passage of the bill by the Legislature, representatives of business and the consumer have asked for specific statements of intention regarding two Sections of the Act.

Jurisdiction of the Superior Court: Assuming a case and controversy within the jurisdictional limitations of the Superior Court, Section 1780 is not intended to be construed to limit actions under the Act to municipal or justice courts. That is, an action may be commenced under the provisions of the Consumers Legal Remedies Act in the Superior Court.

Statute of Limitations: Section 1783 provides that no action may be commenced more than three years after the commission of the allegedly wrongful method, act or practice. The statute applies to individual and class actions. In order to be included within the class, the Legislature intended that each member of the class would have been injured by a violation of Section 1770 within three years of the commencement of the action. Thus, if A is damaged in 1965, and B,C,D,E,F, and G are injured in 1968, class action may be commenced in 1970 [*] **but A cannot be included within the class.**

The Consumers Legal Remedies Act has charted a new course for protection of the consumer. There is no state or federal precedent for much of the substantive or procedural provisions of the measure. The Legislature therefore anticipates controversy and debate will attend application of the measure during the oncoming months. This in mind Section 1760 was included in the bill to give jurists and advocates an insight into the legislative intent underlying the Consumers Legal Remedies Act. Simply the Title should be construed liberally to promote the objective of efficient and economic consumer protection against unfair and deceptive business practices.

---

[*] This is an error. Section 1756 of the act provides the substantive and procedural provision of the act shall only apply to actions filed on or after January 1, 1971.

A3

LEGISLATIVE INTENT SERVICE    (800) 666-1917